## FENESTRA INCORPORATED *v.* GULF AMERICAN LAND CORPORATION.

1. ACTION—SUBSTANTIVE LAW—EQUITY.

Substantive elements of a cause of action and the kind of remedy available must be determined by reference to the substantive law of actions in law and equity as they existed before the abolition of procedural distinctions January 1, 1963 (GCR 1963, 12).

2. CONSPIRACY—DEFINITION.

A conspiracy is a combination of 2 or more persons, by some concerted action, to accomplish a criminal or unlawful purpose or a purpose not unlawful by criminal or unlawful means.

3. SAME—DAMAGES.

The gravamen of a civil action for conspiracy is not the conspiracy but the wrongful acts causing the damages.

4. SAME—DAMAGES—ACTION.

Conspiracy standing alone without the commission of acts causing damage would not be actionable.

5. APPEAL AND ERROR—NONJURY CASES—REVERSAL.

The Supreme Court does not reverse the judgment of the trial court in a nonjury case unless the judgment is clearly erroneous (GCR 1963, 859).

---

REFERENCES FOR POINTS IN HEADNOTES

[1] 1 Am Jur 2d, Actions § 28.
[2] 16 Am Jur 2d, Conspiracy §§ 1, 43.
[3, 4] 16 Am Jur 2d, Conspiracy § 11.
[5] 5 Am Jur 2d, Appeal and Error § 839 *et seq.*
[6] 5 Am Jur 2d, Appeal and Error § 906.
[7] 16 Am Jur 2d, Conspiracy § 59.
[8, 12, 14] 18 Am Jur 2d, Corporations §§ 497, 498, 500.
[9, 15, 18] 18 Am Jur 2d, Corporations § 503.
[10] 19 Am Jur 2d, Corporations §§ 1034, 1490.
[11] 18 Am Jur 2d, Corporations §§ 484, 485.
[13, 16] 28 Am Jur, Injunctions §§ 28–30.
[17] 5 Am Jur 2d, Appeal and Error §§ 839, 840.

6. Same—Cross-Appeal—Damages—Speculation—Record.

Finding of trial court in nonjury action whereby plaintiff corporation sought compensatory damages from certain directors because certain legal proceedings they commenced barred acquisition of a corporation plaintiff desired to acquire, that plaintiff was not entitled to such damages because of the element of speculation and contingency involved *held*, on plaintiff's cross-appeal, not clearly erroneous under record presented (GCR 1963, 859).

7. Conspiracy—Burden of Proof.

Plaintiff in action for conspiracy need not prove both unlawful purpose and unlawful means, but only one or the other, with concomitant elements.

8. Corporations—Majority Stockholder—Fiduciaries.

The fiduciary capacity which devolves upon a majority stockholder comes about when such stockholder is in actual control and management of the corporation.

9. Conspiracy—Corporations—Control—Fiduciary.

Finding of trial court that plaintiff corporation had proved conspiracy on part of defendant purchaser of 46% interest of plaintiff's stock in that it had bought the stock admittedly for the purpose of control of the corporation, and that such control was for the purpose of serving such purchaser's own best interests and not the interests of the corporation and its other stockholders *held*, unsubstantiated, where evidence does not show that such purchaser had only self-interest in mind, even if it had been in control in a fiduciary capacity.

10. Corporations—Intercorporate Loans and Mergers—Statutes.

Intercorporate loans and mergers of corporations are provided for by statute (CL 1948 and CLS 1961, §§ 450.46, 450.52–450.56, as amended by PA 1962, No 155).

11. Same—Contracts with Stockholders—Burden of Proving Fairness.

The burden of proving the fairness of a contract between a corporation and its stockholder is upon the latter (CL 1948, § 450.13, subd 5, as amended by PA 1962, No 169).

12. Same—Loans—Merger—Fiduciary—Equity.

Equitable relief would be available to stockholders actually threatened by acts of majority stockholders in violation of their fiduciary obligation with respect to loans or merger (CL 1948 and CLS 1961, §§ 450.46, 450.52–450.56, as amended by PA 1962, No 155).

13. INJUNCTION—IMMINENT INJURY—APPREHENSION OF POSSIBLE FUTURE INJURY.

Injunctive relief may be predicated upon imminent injury or damage, not upon apprehension of possible future injury or damage.

14. SAME—PURCHASER OF STOCK—APPREHENSION OF POSSIBLE FUTURE ABUSE OF FIDUCIARY RELATION.

Alleged apprehension that at some future stockholders' meeting, the purchaser of 46% of stock of corporation whose stock is publicly held would utilize its voting rights to elect a majority of directors subservient to the purchaser, and who would disregard obligations of directors and of the interests of the corporation and its minority stockholders *held*, an insufficient basis upon which to grant injunction against purchaser's use of voting rights of the stock.

15. SAME—PURCHASER OF STOCK—FUTURE TRANSACTIONS WITH CORPORATION.

Record presented in action by corporation against participants in transfer of a 46% interest of its capital stock *held*, not to afford any basis for concluding that any and all future transactions between the corporation and purchaser of the stock, also a corporation, would necessarily be unlawful and damaging to plaintiff, hence injunction for imminent irreparable injury was not justified.

16. CORPORATIONS—DIVESTITURE OF STOCK—IMMINENCY OF IRREPARABLE INJURY.

Divestiture of stockholdings and removal of directors involved in transfer of 46% interest of stock in corporation whose stock is publicly held, was harsh relief not justified by record not supporting trial court's finding that the purpose of the purchase was unlawful or that there was imminency of irreparable injury.

17. APPEAL AND ERROR—QUESTIONS REVIEWABLE—CORPORATIONS—CONSPIRACY—DAMAGES.

Whether means of acquiring 46% stock interest of corporation whose stock was publicly held was achieved unlawfully is not discussed, where trial court was clearly erroneous in granting relief of injunction, divestiture, and removal of directors after finding an unlawful purpose in acquiring the stock without making a specific finding as to means of so doing, and neither actual nor imminent damages were shown.

18. SAME—PURCHASE OF CONTROLLING INTEREST.

Courts may not interfere to prevent the lawful purchase of a controlling interest in a publicly held corporation.

Appeal from Wayne; Piggins (Edward S.), J. Submitted April 7, 1965. (Calendar Nos. 13, 14, Docket Nos. 50,728, 50,738.) Decided April 5, 1966.

Complaint by Fenestra Incorporated, a Michigan corporation, against (a) Gulf American Land Corporation a Florida corporation, G.A.L.C. Co., an Illinois corporation, Leonard Rosen, Julius J. Rosen, Sidney Friedman, James A. Farley, Jr., (b) Harry Brainin, Irving Taub, Irving Projansky, F. B. Kaiserman, Argus Capital Corporation, a Delaware corporation, (c) Atkinson Corporation, a Wisconsin corporation, Jay Pritzker, Robert A. Pritzker, Jack Pritzker, and A. N. Pritzker, for conspiracy in connection with sale and purchase of a substantial block of its corporate stock, allegedly to accomplish unlawful purposes.

Action combined and heard with complaint of G.A.L.C. Co. against Fenestra Incorporated and certain of its directors to enjoin proposed purchase of an allied industry, which action was dismissed during proceedings.

Judgment for plaintiff ordering divestiture of all defendants' interests in Fenestra Incorporated, removal of defendant directors, and appointment of receiver for public sale of corporate stock, but denying money damages.

Separate appeals by defendants Gulf American Land Corporation and its affiliates, and by Harry Brainin and his affiliates. Cross-appeal by plaintiff from denial of money damages, as to which judgment is affirmed.

Reversed and complaint dismissed.

*Butzel, Eaman, Long, Gust & Kennedy (Rockwell T. Gust, Victor W. Klein* and *John L. Vanker,* of counsel), for plaintiff.

*Dickinson, Wright, McKean & Cudlip (Edgar C. Howbert, W. Gerald Warren,* and *John E. S. Scott,* of counsel), for defendants Gulf American Land Corporation, G.A.L.C. Co. and Rosen.

*Dickinson, Wright, McKean & Cudlip,* and *Cole & Deitz,* of New York City (*Myron J. Weiss,* of counsel), for defendants Friedman and Farley.

*Honigman, Miller, Schwartz & Cohn (Avern Cohn, John Sklar,* and *Asher Rabinowitz,* of counsel), for defendants Brainin, Taub, Projansky, Kaiserman, and Argus Capital Corporation.

*Butzel, Levin, Winston & Quint (Henry H. Sills, Morris W. Stein,* and *Jerome S. Fanger,* of counsel), for defendants Atkinson Corporation and Pritzker.

SMITH, J.   In brief, this is a suit brought by Fenestra, on authorization of a majority of its board of directors, against three groups of defendants who allegedly conspired to deliver control of Fenestra to Gulf (one of the three groups) for the purpose of having Fenestra's large amount of current assets exploited for the sole advantage of Gulf. The dollar amount involved is in excess of $6,000,000 and the stock interest involved is about 46% of the total common stock outstanding, something in excess of 293,000 shares. In claiming conspiracy by all defendants (including the seller, the purchaser, and the middleman), plaintiff sought and obtained not only an injunction against the purchaser voting the controlling stock interest but also divestiture of the stock and removal of four directors who had gained

their places on the 11-man board at the instance of either the purchaser or the seller. All defendants appeal, and plaintiff Fenestra cross-appeals from a disallowance of money damages.

## I. PARTIES TO THE ACTION.

### A. Fenestra—the Object of Control.

Plaintiff Fenestra is a Michigan corporation engaged in the manufacture of automotive springs and also certain building products for which it is, perhaps, best known. Since 1957, the corporation has been listed on the New York Stock Exchange and, although publicly held, its 637,721 shares are distributed among only 1,200 stockholders.

Fenestra has four divisions of which the automotive spring division is most successful. In fact, the other three divisions, referred to as the building products divisions, have lost substantial sums of money in the last several years. As a result, Fenestra has an income tax loss-carry-forward of $4,300,000 which can be used to offset profits in certain annual instalments up to and including the tax year of 1967, if Fenestra can generate profits in the operable years. Despite company losses, Fenestra had a strong financial position with current assets substantially greater than current liabilities. Current assets included approximately $7,-700,000 in cash items and $9,500,000 of notes and accounts receivable, inventories, and prepaid items, as compared with current liabilities estimated at $2,800,000. The company also owed a balance on a long-term debt to Prudential Life Insurance Company of approximately $4,880,000.

The majority or management directors include Orren Leslie, president, William P. Porch, vice-president and treasurer, D. S. Burnett, who is head of the automotive spring division, H. D. Palmer, a

former president, V. W. Klein, a member of the law firm which represents the company, and M. E. Templeton. The combined stockholdings of the six management directors is 2,952 shares.

### B. Gulf Group—Purchasers of Control.

At the head of the Gulf group is the Gulf American Land Corporation, not to be confused with its wholly-owned subsidiary, the G.A.L.C. Company. The Gulf American Land Corporation was organized in 1957 as a Florida land development company by two brothers, Leonard and Julius Rosen. It is described as one of the two largest Florida land development companies and its principal projects are Cape Coral near Fort Meyers and Golden Gate Estates near Naples, Florida. Gulf is listed on the American Stock Exchange and is, of course, a publicly held corporation. Gulf has shown a substantial profit each year since its organization and according to its audit report of August 31, 1963, had gross assets of approximately $167,000,000 with a net value of approximately $31,400,000.

It is conceded to be typical of such land development companies as Gulf that as they convert raw land into marketable building sites, the overall outlay of cash is substantially greater than the incoming cash from sales. This results in what is described as a negative cash flow which prevails for several years until a sufficient amount of building lots have been sold to the point where the aggregate of receipts equals or exceeds the aggregate of current development costs. Until this condition is reached, it is necessary for such companies to finance their land development operations by borrowing substantial amounts of money. There is nothing to show that Gulf had not been successful in obtaining, at higher interest rates, at least, substantial loans for its operations. It was this con-

tinuing need for cash which plaintiff says spurred
Gulf to seek and obtain controlling interest in
Fenestra, a company with a high proportion of liq-
uid assets which could be, in some manner not fully
explained, converted to the use of Gulf.

Included also in the Gulf group is the G.A.L.C.
Company, a wholly-owned subsidiary of Gulf, which
was incorporated solely as a security device in con-
nection with the financing of the purchase by Gulf
of the controlling interest in Fenestra. The stock
was bought in the name of the G.A.L.C. Company
whose stock and voting rights in turn were pledged
to the lender, defendant Pritzker.

Also identified as part of the Gulf group were
two of Gulf's nominees to the board of directors of
Fenestra. One was Sidney Friedman, a New York
lawyer and director of various banks and other com-
mercial enterprises, who had previously assisted
Gulf in connection with certain financial transac-
tions. The second such board nominee was James A.
Farley, Jr., a New York bank president, who like
Friedman was nominated by Gulf and elected to the
Fenestra board but removed by the judgment of the
trial court.

## C. The Brainin Group—Sellers of Control.

Harry Brainin was the manager of a joint venture
consisting of approximately 80 persons who had ac-
quired, several years prior to the Gulf group coming
into the picture, a large amount of Fenestra stock.
In this group were Brainin, Irving Taub, Irving
Projansky, Dr. F. B. Kaiserman, and the Argus
Capital Corporation, which corporation included as
stockholders the four defendants named immedi-
ately above. It was this group, enlarged in number
as the stock acquisitions grew, which sold the ap-
proximate 293,000 shares of Fenestra stock to
G.A.L.C. Company (the Gulf subsidiary), constitut-

ing 46% of the shares outstanding, at a price in excess of $7,000,000, as will be more fully set forth below.

## D. The Pritzker Group—Arrangers and Financiers.

The Pritzker defendants are a family group consisting of A. N. Pritzker, Jack Pritzker, Jay Pritzker, members of a Chicago, Illinois, law firm known as Pritzker & Pritzker, and Robert Pritzker, an engineer, who, like Jay, is the son of A. N. Pritzker. For a number of years the Pritzker firm has been engaged in finance and investments. In 1959, several years prior to the advent of either Gulf or Brainin into the Fenestra picture, the Pritzker family had purchased 20,000 shares of Fenestra stock. The Pritzker family still owns these shares. The Atkinson Corporation, which is principally engaged in financing, is a Wisconsin corporation in which the Pritzker family owns approximately 50% of the stock.

## II. STATEMENT OF THE CASE.

### A. Brainin's Acquisition of Shares Sold to Gulf.

Before the entry of Gulf into the picture, defendant Brainin had become very much interested in Fenestra stock, despite Fenestra's recent history of losses. In 1962, Brainin began to purchase Fenestra stock individually and with associates. Most of the shares which were eventually sold to Gulf were registered in Brainin's name, with the power to vote the shares in corporate proceedings. The largest block of shares purchased by the Brainin joint venture was bought from the Wyman brothers, Frank and Thomas, both of whom were, at the time, Fenestra directors. The amount purchased from the Wymans was 120,000 shares. Another large group of shares, 40,000, was purchased from another Fenestra direc-

tor, A. L. Doering. Thereafter, the Wyman Brothers and Doering and an associate, C. G. Beavers, resigned from the Fenestra board with defendants Brainin, Taub, Projansky, and Kaiserman taking their places on the board in a manner set forth below.

## B. Hostilities Between Brainin and Management.

Prior to the March, 1963, annual meeting of the board of Fenestra, the Brainin group had acquired something in excess of 243,000 shares of Fenestra stock.[1] Although the Brainin group were the major stockholders of Fenestra, no one of the group was an officer of the corporation and at no time did their influence exceed that of having four members on an 11-man board of directors. However, the group were members interested in control but, for one reason or another, did not seek it.

Immediately after the acquisition of the Wyman shares, Brainin, Taub, and Projansky were elected to the board of directors of Fenestra, that is, on July 24, 1962. The fourth member of the Brainin group, Kaiserman, was not elected until the annual stockholders' meeting in March, 1963. Differences between the Brainin group and the management directors started to develop almost immediately after the group's large acquisition of stock and the election of its first three men to the board. These three directors, Brainin, Taub, and Projansky, requested of President Leslie that they be permitted to inspect the various Fenestra plants around the country. The request was first rejected in its entirety, but later Brainin alone was permitted to make inspections.

---

[1] An additional 50,000 shares, making up the 293,000 plus shares, the amount eventually sold to Gulf, was acquired sometime before the sale to Gulf.

Hostilities between the Brainin group and the management directors became more open at a board meeting held in April, 1963. The dispute occurred over the makeup of a newly-revived executive committee, a committee which was given no power except that of making recommendations. Brainin, as chairman of the executive committee, wanted Projansky as a member of that committee but was opposed by President Leslie and Director Klein. A heated argument took place between the Brainin group directors and the management directors, or at least some of them. The matter was resolved; however, it left some bitterness. Thereafter, the Brainin group decided to sell its large shareholdings in Fenestra and so advised a broker, who, in turn, advised a member of the Pritzker group, which group already owned 20,000 shares of Fenestra and had indicated an interest in purchasing additional Fenestra shares.

*C. Brainin Discusses Possible Sale to Pritzker.*

As already mentioned, before the Gulf group became a part of the picture, the Brainin group had become unhappy with their holdings in Fenestra and had decided to sell. In the early part of May, 1963, a member of the Pritzker group and Brainin discussed the possibility of the sale of Brainin's large holdings to Pritzker. Brainin's asking price was the book value per share or approximately $23.50. This figure was substantially greater than the market price as reflected on the New York Stock Exchange. The Pritzkers declined the invitation to purchase the Brainin shares but conceived of the idea of contacting Gulf, a company with which it was familiar, and suggesting that it consider the purchase of the Brainin shares in Fenestra. Pritzker was familiar with the Gulf operation because

Pritzker had assisted in financing some of the loans made by Gulf for its land development operations.

### D. Gulf Enters Picture.

On May 13, 1963, or thereabouts, Jay Pritzker contacted Leonard Rosen of the Gulf group and told him of the availability of Brainin's large shareholdings in Fenestra and suggested that it might be a desirable deal for Gulf to purchase the Fenestra shares. Before this, Rosen was not acquainted with Fenestra.

On May 16, 1963, Pritzker met with Rosen and other members of the Gulf organization and the recent financial history of Fenestra was reviewed. The offer of Pritzker to lend money to Gulf to help finance the purchase of this large block of Fenestra shares from Brainin was attractive to both Pritzker and Gulf. The parties discussed the fact that Fenestra had substantial liquid assets and that this high liquidity might be enhanced by disposing of the three building products divisions (which were the money losers) and retaining the automotive spring division which was the substantial earner for Fenestra. The possibility of a merger of Fenestra with Gulf was discussed but was advised against because of the possibility of losing Fenestra's operating loss-carry-forward tax benefits. The possibility of Fenestra lending Gulf money, with appropriate security, was also discussed. An understanding was reached that Gulf could borrow money from the Pritzker group to finance the purchase of some 290,000 shares at $21 per share which was less than book value but more than the market price. Gulf expressed a keen interest, subject to inspection of Fenestra plants and inventory.

Events thereafter moved rapidly. May 22 through May 24, 1963, a member of the Pritzker group and of the Brainin group made an inspection

of several Fenestra plants.  On May 28th Leonard Rosen of Gulf met with Jay Pritzker and a number of financing documents were drawn up.  Jay Pritzker, with Gulf approval, organized the G.A.L.C. Company as a wholly-owned subidiary of Gulf and nominal purchaser of the Fenestra shares from Brainin.

On the following day, May 29th, Jay Pritzker went from Chicago to Detroit to meet with V. W. Klein (a Fenestra attorney and a member of the board). The imminence of the sale of the Brainin shares was discussed.  Matters attendant to this substantial transfer of stock ownership were also discussed, such as the election of Gulf nominees to the board, the possibility of disposing of losing divisions of Fenestra, and the possible use of excess liquid funds in specialized financing transactions, including the possibility of lending money to Gulf at the higher interest rates of finance companies, secured however by some of Gulf's land contract receivables.

Several days later the information was relayed to Gulf that the management directors of Fenestra would be opposed to any loans to Gulf and that, as to the election of Gulf nominees to the board immediately, in advance of the next annual meeting of the 6 majority or management directors were agreeable to electing only 4 of Gulf nominees.  Thereafter, on June 1, 1963, Jay Pritzker advised President Orren Leslie that Gulf was prepared to purchase the Brainin stock.  Rosen advised Pritzker that Gulf was willing to take the transaction without getting immediate control of the board and without anticipating any accounts receivable financing between Gulf and Fenestra.  On June 3d, the Gulf board met and approved the purchase of the Fenestra shares and the financing of said purchase as developed by Jay Pritzker.

*E. Gulf Buys Brainin's Holdings in Fenestra.*

After reviewing the financial condition of Gulf, Brainin agreed to go forward with the deal. Brainin expressed a desire to have a large cash down payment and collateral for the balance, which was duly arranged. The terms agreed upon were $1,-750,000 in cash and the balance covered by a one-year promissory note secured not only by the Fenestra stock being purchased by Gulf but, also, 500,000 shares of Gulf common stock. In addition, the loan was guaranteed by Gulf and personally by Leonard Rosen. The Atkinson Corporation, controlled by the Pritzkers, agreed to and did lend Gulf the $1,750,000 down payment, which loan was evidenced by a one-year collateral note of $1,995,-000, being the amount of the loan plus $245,000 interest. One of the stipulations in an agreement of the same date as the note was that if Gulf obtained any money from Fenestra it would be applied first toward payment of said note. In addition, Gulf gave Pritzker a note for $600,000 and agreed to pay one Herbert Buschman a broker's fee of $37,500. The total number of Fenestra shares deposited with the escrow agent in the next several weeks after the deal was closed amounted to 293,674 shares and sold at $21 per share, for a total of $6,-167,154, not including the interest on the down payment loan by the Atkinson Corporation (of the Pritzker group) nor the $600,000 to Jay Pritzker for arranging the deal nor the $37,500 paid to Buschman as a broker's fee. Gulf's total cost then was somewhat in excess of $7,000,000. And although Gulf had pledged a substantial amount of its stock and other security to effectuate the deal, it was not required to advance any cash at that time.

*F. After Gulf's Purchase—Events Leading
to Lawsuit.*

After the purchase agreement had been entered into, Gulf issued a press release announcing that it had purchased a substantial block of Fenestra shares for "investment purposes." On June 14, 1963, Farley, Friedman, and Herzfeld, an attorney for Gulf, met with Fenestra representatives and advised them that Gulf, along with others, held the majority of stock in Fenestra and requested that six of the 11 positions on the board of directors be immediately given to Gulf representatives. Gulf was advised that the majority, or management, directors were opposed. They agreed, however, that Farley and Friedman would be elected immediately and that consideration would be given to other Gulf nominees. It had been hoped by Gulf that at a meeting of the board of directors they could obtain control of the board without having to await the next annual meeting of stockholders which would not take place for another 8 or 9 months, that is, in March, 1964.

What came to be of unusual importance in the next several weeks leading up to the all-important June 28th meeting of the Fenestra board of directors was the question of the acquisition by Fenestra of a smaller company known as Freeman Industries. This agricultural implement company was first mentioned to Fenestra management by Brainin back in January, 1963. Only slight mention was made of Freeman by management in the May 13 and May 16, 1963, meetings of the Fenestra executive committee, but it was indicated that a visit to Freeman was to be made May 29th. At or about the time of the sale of the Brainin group shares to Gulf, Fenestra President Leslie visited Freeman and became increasingly interested in its possible acqui

sition. In the early part of June, 1963, he sent two assistants to Freeman Industries located in Peru, Indiana, for the purpose of examining the financial statement and assets of Freeman. President Leslie arrived at an understanding with Freeman and on June 21st signed a commission agreement with a Mr. Russell, the broker's representative. At the time of this informal agreement with Freeman, Fenestra management had not sought any independent appraisal or analysis of Freeman; it was done afterwards, that is, in July, some 5 or 6 weeks after Gulf had acquired the controlling interest in Fenestra stock and evinced a keen interest in some kind of transaction between Gulf and Fenestra. Arrangements were made by President Leslie for an immediate analysis of the proposed Freeman acquisition with Robert Heller & Associates, a firm of management consultants. On July 17, 1963, President Leslie and Director Klein met with Heller representatives, and on July 26th a report was furnished to Fenestra by Heller. The results of the Heller report were not communicated to the minority or Gulf group directors at any time prior to the scheduled meeting of the board in which the proposed Freeman acquisition was on the agenda for approval. It should be added that the Heller report, although generally favorable to the acquisition, was guarded in its appraisal of Freeman for several stated reasons. For one thing, Freeman's success was thought to be due largely to one man, Mr. Freeman, its president, giving rise to uncertainties in the event he should no longer manage the firm. Another possible weakness was said to be in the fact that Freeman manufactured "short line" or specialty farm implements which could be in jeopardy at any time from the competition in that industry. Another reservation in the Heller report was the fact so much of Freeman's product was sold to one

customer, Allis-Chalmers. The Gulf group was opposed to the acquisition. Later, both sides accused each other of bad faith: the management directors said Gulf was opposed because Gulf wanted to keep Fenestra assets available for a possible deal with Gulf; Gulf said management interest was spurred only after Gulf came into view as a possible purchaser of controlling interest. Gulf claimed that management wished to engage Fenestra assets in any way possible so as to discourage Gulf interest which appeared as a threat to entrenched management which had little stock interest but great interest in salaries and fees.

### G. June 28th Board Meeting—Hostilities Between Management and Gulf.

The June 28th board meeting began with President Leslie reading from a prepared statement in which he related that he had received a number of reports concerning the true intentions of Gulf. In view of these reports, he said that management felt a duty to inquire of Gulf's nominees to the board what was the true financial condition of Gulf and whether it intended to gain control of Fenestra to use Fenestra's resources to finance Gulf's development operations. The entire board meeting was stenographically recorded. In launching into its business, the resignations of Brainin and Kaiserman were accepted and Gulf nominees, Friedman and Farley, were elected in their places. Immediately thereafter, hostilities broke into the open. What had been brewing for some time quickly came to a head. Fenestra's attorney and director, Mr. Klein, using a prepared set of questions, proceeded on behalf of the managing directors, to question Gulf's other nominees for the record. During the course of questioning Klein said (to be brief about it) that the purposes of Gulf acquiring control were unlawful. The

first nominee questioned was a Mr. London, a certified public accountant from Baltimore, Maryland. After certain preliminary inquiries were made as to London's background and relations with Gulf, Mr. Klein then proceeded to ask him questions probing into the need of Gulf for funds and into its purposes and plans for acquiring Fenestra stock. On the advice of Mr. Friedman, who is an attorney, London refused to answer the questions. Other Gulf nominees, Herzfeld and Burgess, were also advised not to respond to any questions of Mr. Klein beyond that of their personal qualifications to serve as directors. Gulf later characterized this as "third degree" treatment. Fenestra management said it was done pursuant to their fiduciary duty.

It was considered pointless to proceed with any further questions of London, Herzfeld, and Burgess, whereupon the board took up the matter of the proposed purchase of Freeman Industries. President Leslie and Vice-President Porch strongly recommended that the board approve the transaction. It was felt that the acquisition was an advantageous one for Fenestra; terms were discussed as well as other details of the Freeman operation. No action was taken on the matter at this June 28th meeting although management indicated that its 6 directors had already made up their minds to purchase Freeman. The next scheduled directors' meeting was set for July 29, 1963.

### H. Both Sides Prepare for Lawsuits.

After the June 28th board meeting, President Leslie requested of Mr. Klein, the attorney, an opinion as to whether the management directors had grounds for a lawsuit and was advised in the affirmative. Before the next scheduled board meeting of July 29th, Mr. Leslie was shown a first draft of a complaint. On July 24th, Friedman received a

copy of a proposed contract for the acquisition of Freeman Industries, which item had been placed upon the agenda for the upcoming board meeting of July 29th. However, just a few days prior to the scheduled board meeting, that is, on July 26th, Gulf, through its subsidiary G.A.L.C. Company, filed a complaint against Fenestra seeking to restrain it from entering into a contract for the acquisition of Freeman Industries. A preliminary restraining order was issued and a hearing on the order to show cause was made returnable one week from the filing of the lawsuit. The Gulf suit to restrain Fenestra was filed on Friday, July 26th, and promptly on Monday, July 29th, this particular action was filed by Fenestra against the numerous defendants named above. The cases were consolidated for trial and it was stipulated that the hearing on the orders to show cause issued in the cases would constitute a hearing on the merits.[2] With only a few breaks in between, the matter was heard almost continuously from September 3d through December 3d, 1963. There are approximately 5,000 pages of transcript made in proceedings below, and in this Court the record fills approximately 26 volumes, including exhibits. There are also nearly 700 pages of briefs.

### III. Trial Court's Findings and Judgment.

The trial court found that Gulf's principal objective in purchasing the large block of Fenestra stock was "control and not investment." It also found that Gulf's purpose in seeking control was "primarily to serve its own best interests and not the interests of Fenestra and its other stockholders." The Court also found that the suit instituted by Gulf

---

[2] Because Freeman Industries was sold to another company during pendency of this suit, on motion of plaintiff G.A.L.C., its suit was dismissed as moot over Fenestra's objection.

to restrain Fenestra from entering into the Free-
man acquisition deal "was for the real purpose of
preventing the disposition of any of Fenestra's cash
resources or assets until Gulf had obtained control"
and chosen its own method of disposing of such as-
sets.   Gulf's purpose was held to be unlawful and
contrary to public policy.   The trial court concluded
that all of the defendants, that is, the individuals
and companies in the Brainin group and Pritzker
group had entered into a conspiracy with the Gulf
group, the object of which was to place control of
Fenestra in the hands of Gulf for Gulf's sole benefit.
In pursuance of the conspiracy, the court found that
several overt acts had been committed, including the
filing of the lawsuit by Gulf against Fenestra in
restraint of the proposed Freeman acquisition.   The
court held that it had the power to enjoin in order
to prevent impending damages.

In its judgment, the trial court ordered all de-
fendants divested of any interest in Fenestra stock
purchased by the G.A.L.C. Company, the Gulf sub-
sidiary.   Defendants Friedman, Farley, Taub, and
Projansky were removed from the board of direc-
tors by the judgment.   The trial court also ordered
that a receiver be appointed to sell the stock at pub-
lic auction to the highest bidder and that the funds
from the sale be impounded for distribution in ac-
cordance with the further order of the court.   Un-
der such a sale, which has not taken place because
of this pending appeal, none of the defendants would
be able to purchase shares in Fenestra.   In addition,
the trial court restrained the defendants from voting
or exercising any rights or privileges incident to the
ownership of the stock pending divestiture.

## IV. POSITION OF THE PARTIES.

### A. Fenestra's Position.

On this *de novo* review, the position of plaintiff Fenestra is not easy of summary because it contains a veritable diary of events presented in its complaint covering 77 printed pages; in support of its judgment obtained below, it has also filed 3 briefs totaling 310 pages replete with 198 footnotes. Hopefully, our categorizations and summaries will sacrifice none of plaintiff's flavor. Plaintiff's position is that each and every defendant is engaged in a gigantic conspiracy, using unlawful means and pursuing unlawful ends, and that such conspiracy was pursued to the point where irreparable damage to the corporation was imminent and actual damage had already occurred.

Plaintiff's position will not suffer from the emphasis of repeating, in part at least, from its complaint:

"The defendants, and each of them, participated in and had or are chargeable with knowledge and consented to the plan and conspiracy, and acted in furtherance thereof, hereinafter alleged.   *   *   *

"The above acts of defendants and purpose of their plan and conspiracy are unlawful, as are the means by which such plan is to be carried out, which, if achieved and further carried out as above set forth, would perpetrate a fraud upon plaintiff and its minority stockholders and would be contrary to the law and public policy of the State of Michigan.   *   *   *

"Unless the unlawful conspiracy of the defendants and the unlawful means by which said defendants seek to accomplish the purposes and ends of said unlawful conspiracy are enjoined and restrained forthwith, during pendency of this action, and permanently by this court of equity, plaintiff

and its minority stockholders will suffer immediate great irreparable harm and damage."

Fenestra says that as to the Gulf group the propriety of their actions must be tested by standards "applicable to self dealing by a fiduciary." Fenestra says the action by Gulf (*i. e.*, G.A.L.C. Co.), as a controlling stockholder in Fenestra, in seeking to restrain the proposed Freeman acquisition was in violation of its fiduciary duty.

As to the Pritzker group, plaintiff Fenestra says that they brought the deal to Gulf and that Jay Pritzker was the "architect" of the conspiracy. Fenestra says Pritzker devised the arrangement whereby "Gulf would use Fenestra's assets to pay for its [Gulf's] purchase of the stock and to pay other indebtedness." Fenestra adds that Pritzker was thus "aiding and abetting Gulf in a breach of fiduciary duty." Fiduciary standards are also applicable to the Brainin group, says Fenestra. "But", says Fenestra, "their application is not essential because they [Brainin] not only had adequate warning of Gulf's purposes and intentions to require them to investigate (before selling control), but that they had actual knowledge sufficient" enough to make the sale "wrongful even under 'common honesty' standards."

## B. Gulf's Position.

Gulf says that perhaps the single most important fact about the entire lawsuit is the fact that although its subsidiary G.A.L.C. Company acquired 46% of Fenestra's outstanding stock, it has never acquired control of Fenestra (it will be remembered that the events leading up to this lawsuit happened well in advance of the next scheduled annual meeting of stockholders). Gulf says, this being a civil conspiracy suit, that plaintiff Fenestra must satisfy the

court that two or more of the defendants combined either to accomplish a lawful purpose through unlawful means or to accomplish an unlawful purpose, citing *Veriden* v. *McLeod,* 180 Mich 182, and *Peoples Savings Bank* v. *Stoddard,* 359 Mich 297 (83 ALR2d 344).

Gulf says, first of all, that there was nothing unlawful in the means by which it obtained Fenestra's shares. Gulf concedes the obvious, that is, that it paid a price per share greater than the market value of Fenestra but says that there is no law which prevents a purchaser from paying a premium in connection with the purchase of shares.

In addition, Gulf, in answering Fenestra's charge, says that the fact that it borrowed all of the money necessary to purchase the Fenestra shares is of no consequence because, in the first place, there is nothing wrong with borrowing money and, in the second place, that it put up substantial collateral, both personal and corporate, to assure repayment of the loans and other financing of the transaction. Anyway, Gulf says, when money is borrowed it becomes the borrower's money and the fact that it is borrowed money does not, in and of itself, taint the transaction in which it may be used.

As to whether or not its purpose was unlawful in purchasing the Fenestra shares, Gulf says that the purchase of shares for control of a corporation is a normal everyday occurrence and has solid support in the law.

Gulf says that the finding that it intended to misuse its control of Fenestra (assuming that it would have gained control at the next annual meeting of shareholders), is totally lacking in support from the evidence. Gulf readily concedes that prior to its purchase the possibility of a merger of Fenestra and Gulf was discussed and also the possibility that Fenestra might be asked to lend money to Gulf was

discussed but never concluded. Gulf also readily concedes that it considered the possibility of changing the corporate direction of Fenestra because all parties, including Fenestra management, were in agreement that something ought to be done about the building products divisions which were steadily losing money for all Fenestra stockholders. Gulf argues that neither the possibility of merger, loans, or change in corporate direction is unlawful *per se,* but admits that they could be made unlawful, however depending upon the manner in which either might be accomplished. This, Gulf says, could only be determined when and if a specific proposal were made. It should be pointed out that neither side contends that any specific proposal has yet been made.

Gulf points out that the trial court laid heavy stress upon the conclusion that Gulf intended to pay for its purchase of Fenestra shares out of Fenestra's own assets. Gulf says that the record will clearly show that both the down payment note made to the Atkinson Corporation of the Pritzker group is well secured by Gulf stock and that the balance due to the Brainin group is also secured by over $7,000,000 worth of Fenestra and Gulf stock. Gulf says that the only way Fenestra money could be used to discharge these obligations would be either by theft (which not even Fenestra claims is intended) or by borrowing from Fenestra or merger with Fenestra. In either a loan or a merger, Gulf asserts that the other shareholders of Fenestra would necessarily be protected as a matter of fact and of law.

Gulf also strenuously objects to the judgment of divestiture which, it claims, is an extraordinarily harsh remedy, used almost exclusively in antitrust and antimonopoly cases where no other remedy will suffice. Without conceding that any of its actions was unlawful, Gulf suggested to the trial court

before judgment that *if the court deemed it necessary to protect Fenestra or its minority shareholders that it, Gulf, was agreeable to a judgment of injunction restraining it from acquiring any of the capital assets of Fenestra by merger, loan or otherwise, as well as other forms of relief.*

## C. Brainin Group's Position.

It is the position of the Brainin group that its sale of controlling stock interest to Gulf was made in good faith and that it was a straight stock sale unaccompanied by any commitments or agreements for the transfer of either office or control. "At no time," they say, did the Brainin group "take any action which plaintiff even claims to be detrimental, other than the exercise of their [Brainin's] lawful right to sell the stock which they owned." They take sharp issue with the trial court which found that "The Brainins furnished the material whereby control was to be delivered" and that the Brainin group [as well as the Pritzker group] "benefited financially." Brainin says the only "material" which they furnished was the sale of 46% of Fenestra stock to Gulf which they contend they had a perfectly good legal right to do. Further, Brainin says that the financial benefit which the trial court alludes to is their sale of the stock above current market quotations, which, they contend, is entirely legal.

Brainin rejects the suggestion that as "controlling" stockholders they were fiduciaries for other stockholders, contending that this relationship arises only when stockholders actually assume control of the corporation. Brainin points out that at no time did they have control of the management of the corporation, which must be conceded. Brainin also contends that the proofs are totally lacking, both as to testimony and documents alike, that there was any understanding or agreement with any of the

defendants constituting a conspiracy, reiterating that it was a straight stock sale without any other commitments or private agreements.

They argue that an action for civil conspiracy is essentially an action for damages inflicted by tort pursuant to a preconceived plan for an unlawful purpose or by unlawful means. They say that not only has there been no damage but neither has there been any conduct constituting conspiracy. Assuming, they say, that even if Gulf's intentions had been unlawful there was no tortious damage, hence the suit was prematurely brought, to say the least.

The Brainin group argues further that "Here, no merger, loan, or intercorporate transaction has even been formulated, much less actually submitted or proposed. Yet the judgment below against the selling defendants of necessity rests upon a judicial and conclusive assumption that the purchaser will at some future date propose something so improper and illegal as to require the present drastic and sweeping judgment divesting even the lien rights of the sellers. In effect", they say, "defendants have been convicted of rape without even the semblance of an indecent proposal."

The Brainin group also objects to what is termed the harshness of the remedy of divestiture (of retained lien rights, in their case) and because the divestiture affects not merely the named defendants of the Brainin group, that is, Brainin, Taub, Projansky, Kaiserman, and the Argus Capital Corporation, but also nearly 80 others who were in the joint venture with Brainin but who were not defendants in this lawsuit.

The group also objected to the jurisdiction of the court because they are nonresidents who were served outside the jurisdiction and who claim that their

contacts within the State were insufficient to give the court jurisdiction over them.

## D. *Pritzker Group's Position.*

The main argument of the Pritzker group is that the court did not acquire jurisdiction over any of its members because service of process was made in Illinois where the parties are resident, except for the Atkinson Corporation (the Pritzker control finance company), which is a Wisconsin corporation. The arguments as to the jurisdictional issue are not detailed here because the case is disposed of on other grounds, as will be seen below. However, Pritzker does make a statement preliminary to its jurisdictional argument in which it also takes a position with reference to the alleged conspiratorial conduct.

The Pritzkers, who bought 20,000 shares of Fenestra at a cost of approximately $500,000 before either Brainin or Gulf came into the picture, did not sell their shares to Gulf and, of course, still own them. It will be remembered also that the Pritzkers were the arrangers of the deal and financiers of part of it: they loaned the down payment which Gulf made to the Brainin group. They, too, were not satisfied with Fenestra management and had suggested that management dispose of the losing divisions. It was the Pritzker group, they say, who suggested to management that the Prudential Life Insurance loan be paid because the loan bore an interest rate in excess of the interest yield on the securities in which the proceeds of the loan were temporarily invested. The difference is alleged to be over $100,000 a year. In other words, the Pritzkers say management was losing this much each year by the way in which it handled this portion of its liquid assets. This, they insist, exhibits, on their part, an obvious interest in the welfare of

Fenestra which is totally inconsistent with any assertion that they conspired with the other defendants to cripple Fenestra.

Chief target of the Pritzker group is the suggestion of conspiratorial culpability on their part by reason of the fact that in the loan agreement with Gulf they (Pritzkers) included a provision which would require Gulf to apply any funds that might be derived from Fenestra through merger or a liquidating dividend or other to be applied first to the Pritzker group loan to Gulf. They insist that this is common business prudence and point out that in the loan made by Prudential to Fenestra similar provisions are included.

### V. Decision.

There was little or no credibility question in the trial court for the reason that there was little or no dispute as to the evidentiary facts. Indeed, there was very substantial agreement between plaintiff and defendants as to what was said and done and by whom. What the parties vigorously dispute are the ultimate facts and their significance in law. That, substantially, is what this review is about.

As already explained, this case presents a complaint predicated upon an alleged civil conspiracy wherein not only money damages are sought but also certain equitable relief, including injunction, divestiture, removal of board members, and public sale of stock. That conduct constituting a civil conspiracy may entitle one to equitable relief (as well as law damages) hardly needs citation. However, see *Peoples Savings Bank* v. *Stoddard,* 359 Mich 297 (83 ALR2d 344). The instant case was tried to the court sitting without a jury and the court found that "Plaintiff [Fenestra] has sustained the burden of proof and has proven an actionable

civil conspiracy, which is within the jurisdiction of this court to pass upon and to grant appropriate relief from the threat of injury." The judgment awarded to plaintiff the equitable relief sought but found that no money damages had been proved and therefore denied that part of the claim.

Because we shall be discussing the elements of a civil conspiracy, it should be helpful to note that although the procedural distinctions between law and equity have been abolished in this State since January 1, 1963 (this action was filed July 29, 1963), the substantive elements of a cause of action and the kind of remedy available must still be determined by reference to the substantive law of actions in law and equity as they existed before the merger. GCR 1963, 12. See 1 Honigman and Hawkins, Michigan Court Rules Annotated, p 11.[3] In present context, this means that we shall be examining the elements of a civil conspiracy both as a basis for determining money damages and also as a basis for equitable relief.

### A. Conspiracy Defined.

A conspiracy is a combination of two or more persons, by some concerted action, to accomplish a criminal or unlawful purpose, or to accomplish a purpose not unlawful by criminal or unlawful means. *Veriden* v. *McLeod,* 180 Mich 182. In addition, at the core of an actionable civil conspiracy is a question of damages. This facet of the law of conspiracy is accurately summed up in the case of *Roche* v. *Blair,* 305 Mich 608, 613, 614: "The law is well established that in a civil action for damages resulting from wrongful acts alleged to have been committed in pursuance of a conspiracy, the gist or

---

[3] See, also, with reference to Federal rule prototype, *Stainback* v. *Mo Hock Ke Lok Po,* 336 US 368 (69 S Ct 606, 93 L ed 741), and other cases cited under note 4 to Rule 12, 1 Honigman and Hawkins, Michigan Court Rules Annotated, p 14.

gravamen of the action is not the conspiracy but is
the wrongful acts causing the damages. The con-
spiracy standing alone without the commission of
acts causing damage would not be actionable. The
cause of action does not result from the conspiracy
but from the acts done." In the case of *Auto Work-
ers' Temple Ass'n* v. *Janson,* 227 Mich 430, 433, the
point is made more succinctly: the foundation of
the action is the damage and not the conspiracy.

### B. Trial Court Correct in Refusing
### Money Damages.

We decide first as to whether plaintiff Fenestra
was entitled to actual money damages of a compen-
satory nature. It will be remembered that this por-
tion of Fenestra's claim stems from Gulf's blocking
the acquisition of Freeman Industries by suit for
injunction begun three days before the instant case,
but dismissed during the joint hearing of these two
cases. The grounds for dismissal of the suit by
Gulf (via G.A.L.C.) against Fenestra was that
Freeman Industries was sold to another company
and that, therefore, the injunctive suit became moot.
Fenestra asserts, however, that it is entitled to com-
pensatory damages because Freeman was a good
acquisition, had enjoyed good profits, and also had
an excellent future. So, in this joinder of legal and
equitable causes in one civil action under GCR 1963,
12, we decide first whether or not Fenestra is entitled
to compensatory damages on its cross-appeal.

In denying such damages to Fenestra, we record
herewith a pertinent part of the trial court's opinion
as to that issue:

"There is evidence in this record that the Free-
man operations were profitable and appeared to
have a good potential, but *in their present status.*
Changing their status and absorbing them into
Fenestra could conceivably alter the picture as to

the amount, extent or continued existence of their profitable production. Freeman was an established business but of Freeman and not of Fenestra. Its continued profitable operation was dependent upon the fulfillment of certain requirements and the happening of certain contingencies as set forth in the Heller report. *No evidence of cost of operating Freeman, under Fenestra management, was introduced, and it is only reasonable to assume that such costs could be much different under Fenestra's method of operation,* which for several years have been sustaining a loss, than they would have been under continued Freeman operation. *The loss which is complained of is anticipatory in its nature* and while profits were promising they were still dependent upon certain elements of speculation and conjecture, including the ever present general economic factors. *The opinion testimony of Fenestra's principal expert witness* in relation to this phase, David V. Johnson of the Heller Company, *substantiates the element of speculation and contingency involved,* and makes it impossible for this Court to determine the existence of damage actually sustained or even to estimate the amount thereof.

"While the future held promise, it is the opinion of this court that this record does not contain sufficiently competent and convincing proof that the plaintiff has or will have sustained damages as the result of not acquiring Freeman and to what reasonable extent. The court cannot assess damages under such circumstances." (Emphasis supplied.)

Under GCR 1963, 859, we do not reverse unless the judgment of the trial court is "clearly erroneous."[4] We find that the trial court's judgment as to this issue of compensatory damages is not clearly erroneous and therefore affirm that portion of the

---

[4] See *Kevreson* v. *Michigan Consolidated Gas Co.,* 374 Mich 465, footnote at page 467. GCR 1963, 810 applied in the *Kevreson Case* is now applicable to the Court of Appeals. It has been replaced since January 1, 1965, by GCR 1963, 859. See 373 Mich lxxxix.

judgment for the reasons set forth immediately below. As the trial court states, there was no evidence of the cost of operating Freeman under Fenestra management. The Heller report, referred to above, points up this deficiency in Freeman's records as follows: "The company recognizes the need to establish a cost system whereby product line costs can be identified and performance measured. Recent union contract negotiations have highlighted the need for this improved control, but the entire costing job remains to be done." President Leslie, himself, admitted, after enumerating some of the factors both in favor of and against the Freeman acquisition that the matter was a question of business judgment as to which honest men might differ in their conclusions. Again, the Heller report, relied upon so much by Fenestra, clearly placed its qualified approval of the acquisition on the assumption that a number of changes would have to be made, like the expansion of credit facilities, improvements in engineering, tooling, material, marketing methods and controls, and changes in the use of management personnel. From a careful review, therefore, of pertinent evidence, we do not conclude that the trial court was clearly erroneous as to this issue.

## C. Fenestra Did Not Prove Grounds for Equitable Relief.

### 1. No Proof of Unlawful Purpose.

Not having proved compensatory damages, the question remains as to whether the plaintiff Fenestra was entitled to the equitable relief granted by the trial court upon the allegations made and proofs adduced. In examining the contentions made in the remainder of this case, we are mindful of the fact that Fenestra asserts and reasserts that not only was Gulf's purpose unlawful but also the means

used by all of the defendants (Gulf, Brainin, and Pritzker groups) were also unlawful. It should be clearly understood, however, that the trial court made no finding that the means used by defendants were unlawful. Its decision was planted squarely upon a finding: (1) that Gulf's purpose was unlawful, and (2) that several overt acts were committed by defendants pursuant to the unlawful purpose. In view of the elements of an actionable conspiracy, cited and quoted above, it is not necessary that Fenestra prove both unlawful purpose and unlawful means: only one or the other, with concomitant elements, of course. *Veriden* v. *McLeod, supra.*

In view of the importance of the specific findings of the trial court, we quote herewith its findings and its conclusions, insofar as they are relevant to our decision:

"A. Gulf's principal objective in purchasing Fenestra stock was control and not investment. * * *

"B. Gulf's purpose in exercising control was primarily to serve its own best interests and not the interests of Fenestra and its other stockholders. * * *

"C. Gulf's purpose was unlawful and contrary to public policy. * * *

"D. The defendants entered into a conspiracy, the object of which was to procure control for Gulf and to benefit themselves, and they committed several overt acts pursuant thereto. * * *

"F. Powers of a court of equity may be invoked to prevent and enjoin threatened and impending damage. Commission of actual damage is not a prerequisite thereto."

Again we are reminded there is little or no dispute about the evidentiary facts. In this vein, Gulf freely concedes that its purpose in purchasing 46% of the stock of Fenestra was control. In doing so, Gulf

takes sharp issue with the trial court which suggested deception was used in attaining this objective. In view of Gulf's admission, we think it is of no consequence to discuss further the fact that Gulf purchased controlling stock interest for just that purpose: control.

We do discuss, however, the trial court's finding that Gulf's purpose in obtaining control was "primarily to serve its own best interests and not the interests of Fenestra and its other stockholders." Again, there is no dispute about the evidentiary facts, only what they mean. Gulf freely admits that it was interested in Fenestra stock because of the attractiveness of Fenestra as a company with poor management but good potential. It admits that there was discussion about the possibility of *loans* from Fenestra to Gulf at finance company interest rates and properly secured by a sufficient amount of Gulf receivables, but the record is completely devoid of any showing that a specific proposal was discussed or that lurking in the loan possibility was any suggestion or proof that a loan would not be mutually beneficial. It is true that one of Gulf's officers, through an intermediary and before the stock purchase, suggested to one of Fenestra's officers the possibility of a substantial loan of sums to be derived from liquidation of unprofitable divisions. Gulf's president indicated that he talked to his board in terms of a $3,000,000 to $5,000,000 loan. But there is not a shred of proof as to terms such as term, rate of interest, collateral, or other. The conversation may be characterized as exploratory and nothing more. This is not to say that every specificity must be proved with computer accuracy, but that there must be proof of facts and circumstances going beyond mere discussions.

Not only as to loan possibilities, but also as to the possibility of *merger* we think the trial court

draws an unnecessary and unproved dichotomy between the interest of Gulf as controlling stockholder and of the company itself and other stockholders. The trial court said "Gulf's primary concern was for Gulf and not for Fenestra." The trial court rejected the testimony of the head of the Gulf group that in the event of mutually advantageous loan or a merger of the two corporations or a change in corporate direction of Fenestra by disposing of the losing divisions, Fenestra stockholders would be "far better off." Terming this "pure speculation," the trial court observed that any such moves could be either advantageous or disadvantageous. In support of this conclusion, the trial court noted what it termed the "vast difference" between Gulf's operation and that of Fenestra. While acknowledging that Gulf's land development business was "well run, eminently successful, on a tremendously large scale," the trial court continued, "there was no assurance, however, that the success of Gulf's management in developing and selling land and improvement would guarantee similar success in operating a manufacturing company." We would add to this, that there was no showing in the record of anything other than general discussions about what might be accomplished by pursuing either suggestion of a loan, or a merger, or a change in corporate direction. Not only was there no showing of a reasonably specific *merger* proposal, but assuming that a reasonable specific merger proposal had been made, then there was no proof that a dichotomy of interest necessarily resulted from any such proposal. The trial court found that, in purchasing control, Gulf was thinking of its own best interests, "without too much regard for the interests of Fenestra and its other stockholders." The court then agreed with the contention of Fenestra that it is "unlawful for a majority stock-

holder to use its fiduciary capacity to obtain access to the resources of the company for the benefit of that majority stockholder, and which is not to the best interests of all of the stockholders." If a majority stockholder is in control and management of a corporation then the principle is valid. *Veeser* v. *Robinson Hotel Co.,* 275 Mich 133. However, the fiduciary capacity which devolves upon a majority stockholder comes about only when such stockholder is in actual control and management of the corporation as the *Veeser Case* points out. See, also, *Levy* v. *American Beverage Corp.,* 265 App Div 208 (38 NYS2d 517), and *Blaustein* v. *Pan American Petroleum & Transport Co.,* 263 App Div 97 (31 NYS2d 934). 13 Fletcher, Cyclopedia of Corporations (1961 Rev), § 5805, p 143. Here, Gulf had never succeeded to actual control and management of the corporation although it is a fair assumption that by owning 46% of the stock it will get such control at some future time. Assuming then, *arguendo,* that it has already obtained such control, the record still is devoid of any proof upon which a judgment can be based that its purpose was self-interest alone. Bearing upon this point, the factors shown by the record were these: a loan or a possible merger (already treated above as being too sketchy for conclusion), and, also, some tentative suggestions about sale of the building products divisions which were losing Fenestra money. As to the latter, both Fenestra management and defendants were in general agreement that said divisions should be liquidated. There is no basis, therefore, for the conclusion that Gulf had only self-interest in mind, even if it had been in a fiduciary capacity.

Further, on the issue of the legality of Gulf's purpose, with reference to intercorporate loans and corporate mergers, such are specifically provided for in the statute law. See CL 1948 and CLS 1961,

§§ 450.46, 450.52–450.56, as amended by PA 1962, No 155 (Stat Ann 1963 Rev §§ 21.46, 21.52–21.56). This is not to say that under every set of circumstances a loan or a merger might not constitute an unlawful purpose. As in every case, the matter would depend upon the facts and circumstances. Further, under CL 1948, § 450.13, subd 5, as amended by PA 1962, No 169 (Stat Ann 1963 Rev § 21.13, subd 5), if any contract between Gulf and Fenestra were properly questioned, the burden of proving the fairness of such contract would be upon Gulf. If in the future, Gulf should advance a proposition which would be unlawfully detrimental to other Fenestra shareholders, equitable relief would be fully available to such stockholders actually threatened.

Thus far, we have shown not only that there is no proof of an unlawful purpose but also that no actual damages have been sustained. There is another reason why the equitable relief given by the trial court should not have been granted and that is there was a failure of proof of the imminency of irreparable injury, assuming that an unlawful purpose had been proved, as well as overt acts in furtherance thereof. For the purpose of analysis *only*, we separate the two general kinds of equitable relief granted by the trial court. In the first analysis, there was the injunctive relief and secondly, other specific relief tailored to meet the threat as the trial court saw it, including divestiture and public sale of stock and the removal of directors from the board.

## 2. No Proof of Imminency of Irreparable Injury.

In the first instance, insofar as the remedy of injunction is concerned, the law of this State is well-settled that the mere apprehension of future injury

or damage cannot be the basis for the issuance of the writ. In the recent case of *Township of Romulus* v. *City of Detroit*, 366 Mich 671, it was held that the fact that plaintiff township was apprehensive of the possibility that if a contract entered into between the city of Detroit and another city were carried out, the water pressure in the mains supplying water to plaintiff township might be so reduced as to present a health hazard; there being no other showing, injunction was refused by the lower court and we affirmed. That an injunction would not lie upon the mere apprehension of possible future injury is a well-established rule which is also clearly followed in *Warren Township School District No 7, Macomb County*, v. *City of Detroit*, 308 Mich 460 (1 Av CCH 1162); *Roberts Tobacco Co.* v. *Department of Revenue*, 322 Mich 519; and *Foster* v. *County of Genesee*, 329 Mich 665.

Of similar import is the language in the case of *Skelly* v. *Dockweiler* (SD Cal), 75 F Supp 11. In that case, certain minority stockholders sought an injunction to restrain the trustees of the majority stock interest from voting the stock in favor of a proposed merger with another corporation. In discussing the failure of the complaint to show injury or damage, the trial court had this to say (p 16):

"In truth, what the complaint alleges is, not facts which would flow from the exercise of the right of the defendants to vote their stock as they please, but fears of what the initial step might result in if the merger is effected. A court of equity cannot use its injunctive power to allay the fears of a litigant. * * * All that the directors have done at the present time is to submit an agreement of merger to the stockholders for approval."

The court observed that "injunctive action is directed only against imminency."

We agree with the assertion of the Brainin defendants in this case that "The essence of plaintiff's complaint therefore is its alleged apprehension that at some future stockholders' meeting, Gulf will utilize its voting rights to elect a majority of directors; that these will be subservient to Gulf, will disregard their obligations as directors, will override the other directors, and will push through some presently unformulated proposal or proposals for misuse of Fenestra's assets, all in blatant disregard of the interests of Fenestra and its minority stockholders."

After such an elaborate presentation of facts by Fenestra what is conspicuously lacking is any proof of imminency of injury or damage. True, there is evidence to show that at least some of the defendants discussed the possibilities of either. a loan from Fenestra to Gulf or a merger between the two corporations, as discussed above. Such possibilities were alluded to in broadest outline, unaccompanied by any significant details. The same applied to the talk of selling the losing divisions. Under such circumstances it is therefore legally impossible to conclude that any and all future transactions between the two companies would necessarily be unlawful and damaging to plaintiff Fenestra.

In going beyond injunctive relief and granting what is admittedly the harsh relief of divestiture and removal of directors, the court predicated this relief upon the finding that not only was the purpose unlawful (with which we disagree) but also that there was imminency of irreparable injury (with which we also disagree). Failing thus in proofs, we hold that plaintiff Fenestra was not entitled to the relief granted by the trial court. Having already discussed the reasons why we disagree with the trial court's findings and conclusions on these points, we pass on to the principal authorities upon which

both the trial court and plaintiff relied. We think each is distinguishable from the case at bar.

### D. Principal Fenestra Cases Distinguished.

In *Turner* v. *Calumet & Hecla Mining Co.*, 187 Mich 238, this Court upheld an injunction restraining Calumet & Hecla from voting for directors who were common to both Calumet & Hecla and a "servient" corporation, where Calumet & Hecla's purpose was clearly shown to be that of domination of the servient corporation for the sole benefit of Calumet & Hecla. Distinguishing facts are, among others, that Calumet & Hecla had installed its own directors as directors of the servient corporation; that the servient corporation was also a mining corporation and a competitor in general; also, it was clearly shown that the purpose of Calumet & Hecla was to provide profitable employment for its mining equipment in the event of decline in Calumet & Hecla's business. Even though this case is clearly distinguishable on the facts, it is important to note that only the remedy of injunction was granted but no divestiture was ordered. Also, the trial court refused, and we affirmed, the request to enjoin Calumet & Hecla from voting its stock for other legitimate purposes in meetings of the so-called servient corporation. Of similar import, is the companion case of *Hyams* v. *Calumet & Hecla Mining Co.* (CA 6), 221 F 529, which was tried in the Federal jurisdiction.

In the case of *Peoples Savings Bank* v. *Stoddard*, *supra*, the illegal purpose, furtively advanced, was admitted on trial and there was (p 339) "ample proof of impending damage in the planned dissolution of the bank" so as to warrant the injunctive relief. In that case, the Michigan National Bank by the use of its employees' trust fund (which had directors in common with the bank itself), operating

through a straw party, obtained control of the stock of a banking competitor in Port Huron. It was admitted that the purpose of obtaining control was to dissolve the competitor bank which would then leave the Michigan National branch in Port Huron the only bank in that city. This was in violation of both Federal antitrust law and Michigan anti-monopoly law. Means used to gain control were also found to be unlawful in that the straw party who became the figurehead president executed a false oath and made numerous other deceptions. In that case, both illegal purpose and illegal means were clear and the equitable relief was proper, in view of the imminency of irreparable injury, that is, dissolution of the Peoples bank, which had already been agreed upon by the directors serving the Michigan National interest.

Clearly distinguishable also is the case of *Ashman* v. *Miller* (CA 6, 1939), 101 F2d 85. In that case, Ashman, the holder of a voting trust certificate in Federated Publications, Inc., brought suit against defendant directors , and voting trustees of Federated, claiming a violation of fiduciary obligations. Director McFarland borrowed money from Federated to purchase stock in Federated. Miller and Weil, who were directors and voting trustees, borrowed money for the purchase of stock in Federated from the International Paper Company, the largest seller of newsprint to Federated. It was held that it was a violation of public policy for a director to borrow money from a corporation or from one of its largest sources of supply to purchase stock in the corporation of which they are directors. The Federal court reasoned that the directors who borrowed money from the corporation's largest supplier placed the directors in a position where there would be a direct and powerful inducement to disregard their fiduciary obligations to the corporation.

In *Ashman,* other distinctions could be made, but the essential problem was one of a fiduciary obligation already assumed as a director as against the backdrop of a clearly spelled-out transaction, neither of which is a present factor in the instant case.

*Maggiore* v. *Bradford* (CA 6, 1962), 310 F2d 519, certiorari denied, 372 US 934 (83 S Ct 881, 9 L ed 2d 766), involved the violation of a fiduciary obligation of a majority stockholder alleged to be in actual control of the corporation. Due to the fact that the essential factual elements of this case are poorly stated, together with the fact that the transaction in question was rescinded before the court had an opportunity to pass upon it (leaving only minor questions such as attorney fees to be passed upon), the *Maggiore Case* cannot be said to be of any value as precedent for the issues before us in the instant case.

The case of *Dale* v. *Thomas H. Temple Co.,* 186 Tenn 69 (208 SW2d 344), is what is known in the financial world as a "looting" or "raiding" case.[5] In that case, action was brought to recover company funds which had been wrongfully diverted and misappropriated by officers and directors. In the instant case, there is no claim by plaintiff Fenestra that Gulf has misappropriated funds or that it intends to do so. By contrast with the *Dale Case,* the present case is one in which Gulf is accused of having generally improper motives which are alluded to no more clearly than that of an intent to arrange a "loan, merger, or otherwise." This is supposed to mean that in some inexplicable way Gulf will acquire, through improper means, assets

---

[5] Selvage, Pirates by Proxy: Guarding Against the Corporate Raider, American Management Association, Inc., AMA Management Report No 4 (1958), Corporate Mergers and Acquisitions, p 107; 78 Harv L Rev 509 (1965); Leech, Transactions in Corporate Control, 104 U of Pa L Rev 725 (1956).

of Fenestra for Gulf's purposes alone.   As already indicated, to support the kind of relief granted by the trial court there must be some reasonably specific showing of the wrong done or its imminency.

Another case relied upon by plaintiff is *Insuranshares Corporation* v. *Northern Fiscal Corp.* (DC ED Pa), 35 F Supp 22.   This was an action against former officers, directors, and certain stockholders to recover damages incurred by the corporation as the result of the sale of control of the corporation "to a group who proceeded to rob it of most of its assets."   This also was a typical "looting" case which manifestly was based upon clear proof of a completed scheme which resulted in the corporation being deprived of most of its assets.   The distinction between *Insuranshares Case* and the instant case is obvious.

We have not discussed in this opinion the question of whether or not the means allegedly employed by defendants were unlawful (as claimed by Fenestra) for the reasons which follow.   First, the trial court made no specific finding as to means, choosing rather to plant decision on a finding of unlawful purpose coupled with overt acts done in pursuance thereof.   Thus, we are denied the always helpful fact analysis of the trial bench, which is invaluable to any appellate court.   Second, although Fenestra claims both unlawful means and unlawful purpose, it is unnecessary in a decision of the case to discuss unlawful means, because whether the means were unlawful (and the purpose lawful) or the means were lawful (and the purpose unlawful), in order to succeed in this civil action (where both legal and equitable relief are sought) it is incumbent upon plaintiff to prove damages, either actual or imminent or both, and plaintiff has done neither.

## VI. Summary.

In this review of a civil action under GCR 1963, in which the merger of law and equity was accomplished, we have measured the facts which were largely undisputed, against the substantive law upon which the action was based. We have agreed with the trial court that plaintiff Fenestra proved no actual damages. However, we have concluded that the trial court was clearly erroneous in granting the equitable relief of injunction, divestiture, removal of directors and public sale of stock. As to the latter, we have so concluded because, despite the length of the record, there is no proof of an unlawful purpose on the part of the Gulf group and, what is more, assuming that this element of a civil conspiracy had been proved, there was also a failure of proof of the imminency of irreparable injury or damage. Thus, denial of equitable relief was indicated.

Although substantial self-interest was shown on all sides, the conduct of the Gulf group in question here, insofar as it had progressed, was not proscribed by law. On the other side of the ledger, the conduct of Fenestra's six management directors, who initiated this action does not appear to have been entirely selfless. They, too, had a particular interest in who controlled the corporation because such control would determine to a large extent their salaries, stock options, or fees.

It is one of the risks of publicly-held corporations that a total stranger may purchase a controlling interest in a particular corporation. If the purchase is not unlawful, the courts may not superimpose their suspicions, predilections and judgments upon the actions of the entrepeneur. This is not to say that the law is impotent to act when real damage is actually threatened or proved. The

books are full of cases reflecting the contrary. In the corporate struggle before us, if, in the future, there is a proven need for court intervention, relief is always available. At this time, it is unfounded and premature.

The judgment is reversed and the complaint dismissed. Costs to appellants.

T. M. KAVANAGH, C. J., and DETHMERS, SOURIS, O'HARA, and ADAMS, JJ., concurred with SMITH, J.

BLACK, J., concurred in result.

KELLY, J., did not sit.