**STUDEBAKER CORPORATION, a Michigan corporation, Plaintiff,**

v.

**ALLIED PRODUCTS CORPORATION, a Michigan corporation, Burt S. Kleiner, and Kleiner, Bell & Co., a California limited partnership, Defendants.**

Civ. A. No. 5283.

United States District Court
W. D. Michigan, S. D.

May 21, 1966.

McCobb & Heaney, Grand Rapids, Mich., Edward C. McCobb, William K. Van't Hof, Hillary F. Snell, Grand Rapids, Mich., of counsel, Warner, Norcross & Judd, Grand Rapids, Mich., Harold S. Sawyer, Wallson G. Knack, Thomas J. McNamara, Grand Rapids, Mich., of counsel, Nixon, Mudge, Rose, Guthrie & Alexander, New York City, Robert Walsh, Milton Black, New York City, of counsel, for plaintiff.

Hillman, Baxter & Hammond, Grand Rapids, Mich., Douglas W. Hillman, Grand Rapids, Mich., of counsel, Fischer, Sprague, Franklin & Ford, Detroit, Mich., Richard Ford, Detroit, Mich., of counsel, Hindin, Sterling, McKittrick & Powsner, Beverly Hills, Cal., Maurice J. Hindin, Ronald M. Sohigian, Beverly Hills, Cal., of counsel, for defendant Allied Products Corp.

Varnum, Riddering, Wierengo & Christenson, Grand Rapids, Mich., F. William Hutchinson, Peter J. Armstrong, Robert J. Eleveld, Jon F. DeWitt, Grand Rapids, Mich., of counsel, for defendants Burt S. Kleiner and Kleiner, Bell & Co.

## OPINION

FOX, District Judge.

### OUTLINE OF THE FACTS

1. Plaintiff Studebaker Corporation is a Michigan corporation and has been known primarily as a producer of automobiles. However, this had been a consistent loss division for Studebaker, and in 1963 it was decided to discontinue the company's automobile division at South Bend, Indiana. Studebaker operates nine other divisions in such areas as appliances, floor machines, small tractors, and electric generators, to name a few.

Studebaker has 2,839,283 outstanding shares of common stock. Members of the Board of Directors own 6,462 shares, of which 5,040 have been acquired since October 1, 1965.

2. Defendant Burt Kleiner is a partner in the Los Angeles brokerage firm of Kleiner, Bell & Co. (hereafter referred to as Kleiner, Bell). He has a history

of close association with members of the operating management of defendant Allied Products (including an $8,000 fee in 1965 for an analysis of a finance arrangement for Allied Products, and an integral part in bringing together two predecessor corporations which merged and then in turn merged with Allied Products), and holds 20,800 shares of the common stock of Allied Products. The firm itself holds 5,000 shares of Allied common, and associates in the firm hold an undetermined amount of that stock, not exceeding 5,000 shares.

Allied Products Corporation has an account with the firm, as do Messrs. Emerman, Sherman and Drexler, board chairman, president, and treasurer, respectively, of Allied Products.

3. Defendant Allied Products Corporation (hereafter referred to as Allied), is primarily a producer of stampings for the automobile industry; however, it also has significant operations in the fields of fasteners and chemicals. It has 1,396,000 shares of common stock, of which 39% is owned or controlled by its present management.

The common stock of Allied is listed on a national securities exchange, to-wit, the New York Stock Exchange, and is registered under the Securities Exchange Act of 1934, as amended. Its transfer agents are Chemical Bank & Trust Company, New York, and Continental Illinois National Bank and Trust Company, Chicago. Its registrars are Hanover Bank of New York, and American National Bank & Trust Company, Chicago.

It is an aggressive corporation, actively engaged in diversification and acquisitions. Allied has never invested over $300,000 in stock purchases in other corporations without ultimately acquiring them. However, all were smaller than Studebaker Corporation.

In May of 1964, Allied purchased Studebaker's stamping plant facilities in South Bend, Indiana, following Studebaker's decision to transfer its automotive operations to Hamilton, Ontario.

On occasion during 1965, there had been some conversations between Mr. Charles Pratt, Studebaker Vice President of Administration, and Allied officials concerning possible acquisition by Studebaker of Allied.

4. Kleiner, Bell & Co. began purchasing Studebaker stock for themselves and their clients in January 1966, and by late January held between 20,000 and 30,000 shares.

5. Studebaker has a loan agreement with a network of six banks, including the First National Bank of Minneapolis. Mr. Robert Fischer is a Vice President of this bank and has association with Studebaker's dealings with the bank.

6. On January 27, 1966, Studebaker submitted a letter to its lending banks requesting a modification of its loan agreements. This letter contained confidential information relating to estimated profits for 1966, as well as a financial breakdown of divisional operations, which are not revealed in Studebaker's consolidated balance sheet in its annual report.

7. Mr. Fischer has known Mr. Kleiner since late 1964. Mr. Kleiner and his firm have been customers of the bank since 1965.

In November 1965, Mr. Kleiner met with Mr. Fischer and Mr. H. L. Korda, in Minneapolis. During their conversation Mr. Fischer mentioned that Studebaker was on the upswing, that they were a valued client of the bank and a major employer in the Minneapolis area (with three divisions there), that there were no large holders of stock in Studebaker, and that he would like to see stock purchased by people friendly to management, since this would insure the best interests of Minneapolis and the bank.

8. On January 11, 1966, Mr. Fischer had contacted Mr. Guthrie, chairman of the board of Studebaker, on behalf of a Mr. Quest of Minneapolis, a representative of a Minneapolis brokerage firm. Mr. Quest was desirous of discussing a possible community of interest between Studebaker and Gould National Batteries.

9. On February 7, Mr. George Murphy, a Hawaiian industrialist of some repute in the financial field, submitted a tender offer for 500,000 shares of Studebaker stock at $30 per share, which was 3¼ points above the market price of the stock on that day.

On February 8, Mr. Kleiner phoned Mr. Fischer, asking him to ascertain what Mr. Murphy's position was vis-a-vis management, since Mr. Kleiner was trying to decide whether to submit the firm's shares and how to advise clients on the tender offer.

Mr. Fischer telephoned Mr. Guthrie and learned that Mr. Murphy had come "out of the blue," as far as Studebaker was concerned. This information was relayed to Mr. Kleiner.

10. Studebaker released its preliminary figures on 1965 earnings on February 7, but the Studebaker board adopted a neutral position regarding the tender offer, leaving Studebaker stockholders to decide themselves whether to accept the offer.

Mr. Kleiner took this to mean that Studebaker was not concerned about anyone taking a substantial position in its stock. On February 11, he called Mr. Sherman and Mr. Drexler and asked if they could come up with a more attractive offer than the Murphy tender. They said they would, and Mr. Kleiner then called Mr. Fischer and explained that Allied might be in a position to make an offer to Studebaker of more than the Murphy tender and asked him to call Mr. Guthrie to see if there would be any interest in such an offer on the part of Studebaker.

As a result, a meeting between officials of Allied and officials of Studebaker was scheduled for February 15.

Mr. Kleiner stated that his interest at this point, aside from being a Studebaker shareholder, was in compensation for bringing the two companies together should anything materialize.

11. On February 14, Mr. Kleiner received a call from Mr. David Gottesman, of First Manhattan Corporation, a New York brokerage firm, advising him of the availability of a block of 175,000 shares of Studebaker stock at $32 per share. Mr. Kleiner unsuccessfully attempted to purchase less than the block at less than the asking price.

12. On February 15, the meeting between Allied and Studebaker managements was held in South Bend. There were general discussions about the possibility of an arrangement whereby the two companies would come together through the use of convertible preferred stock. There were a number of alternative approaches, but under all, present Studebaker shareholders would become holders of convertible preferred stock, present Allied shareholders would be holders of common stock. In order to preserve the benefits of Studebaker's sizeable tax loss carry-forward, it was imperative that Studebaker shareholders have 51% or more ownership in both equity and voting rights.

Studebaker expressed some interest, but because of the uncertainties surrounding Mr. Murphy's final position in the company, it was agreed that nothing further would be done until after that matter was resolved.

13. That same afternoon, Mr. Kleiner was called by Messrs. Drexler and Sherman, and advised that the meeting had gone well and that Studebaker appeared interested. Mr. Kleiner advised them of the existence of the block of Studebaker stock and offered them a portion of it. They declined the offer, and later that day decided they would sell the Studebaker stock they then held. (Late in January, Emerman, Drexler and Sherman had purchased 4,200 shares of Studebaker stock through Kleiner, Bell.)

14. On February 16, having obtained sufficient orders, Kleiner, Bell purchased the block and additional shares of Studebaker. They continued to purchase Studebaker stock for themselves and their customers until the issuance of the restraining order in this case.

Rumors connecting Allied Products with a Studebaker takeover immediately

appeared in financial circles. These rumors were no doubt fueled by Allied's purchase of Studebaker's stamping plant in 1964, and its hiring of several of Studebaker's former automotive employees, plus its reputation for acquisitions.

15. On February 16, the board of directors of Allied Products, at a special meeting recommended the authorization of an issue of one million shares of convertible preferred stock. The issuance of such a stock had been discussed and considered by Allied management since 1964, as a possibly useful method of accomplishing acquisitions.

16. As a result of an exchange of telephone calls, Mr. Kleiner met with Mr. Guthrie in the latter's apartment in New York City on February 20, 1966, and discussed his connections with Allied and his interest in Studebaker.

During these discussions Allied Products was mentioned and Mr. Guthrie stated he had no interest in an Allied transaction of any kind.

Mr. Guthrie brought up the question of board representation for Mr. Kleiner's interests, and the matter was left in a posture wherein Mr. Guthrie would discuss representation for Mr. Kleiner at the next board meeting on February 25.

17. On February 24, Studebaker released estimates of its 1966 earnings, saying in a press release: "We have reasons to believe that our forecasts on 1966 earnings have been ascertained by recent buyers of a substantial quantity of our stock."

It was also stated at that time: " * * that no merger plans or similar proposal exists at Studebaker with regard to Allied. We trust, therefore, that this rumor has been laid to rest."

18. On February 25, 1966, at a meeting of the board of directors of Studebaker Corporation, it was decided not to vote Mr. Kleiner on the board.

19. On March 7, 1966, a meeting was held between Messrs. Ashton and Lovejoy, lawyers retained by Mr. Kleiner, and Mr. Guthrie, dealing with board representation. It was made clear that if no representation for the Kleiner group was forthcoming, there would be a strong possibility of a proxy fight.

20. At Mr. Guthrie's invitation, a meeting was held on March 14, in Mr. Guthrie's office, between Mr. Kleiner, Mr. Arthur Carter, partner in Carter, Berlind and Weill, and Mr. Ralph Shapiro, partner in Kleiner, Bell, on the one hand, and Messrs. Burlingame, Churchill, Manheim and Feuer, members of the Studebaker board, in addition to Mr. Guthrie, on the other hand.

Mr. Kleiner indicated that he was chairman of the Studebaker Stockholders Committee for Better Management (hereafter referred to as the Committee), which was proposing a slate of candidates for the Studebaker board. Attempts to resolve the problem at this meeting were unsuccessful.

21. On March 25 there was a discussion about the costs and consequences of a proxy contest between Mr. Guthrie and Mr. Manheim for Studebaker, and Mr. Walter Spradley, another attorney representing the Kleiner interests, and a final attempt was made to settle the differences between the two parties.

This, too, was unsuccessful, and a complaint was filed in this action on March 31.

22. After the February 24 announcement by Studebaker of no interest in Allied Products, Allied commenced purchasing Studebaker stock through Kleiner, Bell. These purchases continued past March 11, the record date on Studebaker stock, and eventually totalled approximately 24,000 shares.

In addition to the filing of the complaint, the following formal proceedings have taken place:

1. Notices of intent to solicit proxies have been filed with the Securities Exchange Commission by the members of the Kleiner Committee. Studebaker has filed with the Securities Exchange Commission its own notices of intent to solicit proxies, and has submitted to the Securities Exchange Commission substan-

tially all of the claims raised in this suit. The Securities Exchange Commission requested additional information from members of the Kleiner Committee, and finally cleared their proxy materials for release on March 31, 1966. Studebaker's proxy materials had been cleared for release previously.

2. On March 21, 1966, after Studebaker refused to furnish a stockholder list, Richard D. Gittlin, a New York resident and limited partner in defendant Kleiner, Bell & Co., filed suit in the state courts of New York to compel production of the list based on his common-law right to same as a shareholder, and based on a New York statute authorizing such production upon the written authorization of persons holding more than 5% of the stock.

3. On March 22, 1966, Studebaker applied for and received a temporary restraining order from the United States District Court, Southern District of New York, prohibiting the use of the authorizations in the state court suit as violative of the proxy regulations of the Securities Exchange Act, Section 14.

4. On March 25, the District Court entered an order requiring compliance with the necessary regulations before using the authorizations. This order was affirmed on appeal and has now been complied with by Mr. Gittlin.

5. The proceedings in state court continued on the basis of Mr. Gittlin's common-law right to the shareholder list, and on March 30 the court held Mr. Gittlin entitled to the list.

On March 31, an order was entered directing Studebaker to turn over the list in three days, enjoining Studebaker from soliciting proxies until the list had been produced, and directing that the Studebaker annual meeting not be held until thirty days after the production of the list.

This decision has been appealed in the state court by Studebaker, which sought a stay of the order. The stay was granted insofar as production of the list is concerned, but not insofar as the injunc-tion from proxy solicitation or postponement of the annual meeting is concerned.

## CLAIMS

This is a case brought by plaintiff Studebaker Corporation under 15 U.S.C. § 78a, et seq. The original complaint stated a claim under Sections 9(a) and 10(b) of the Securities Exchange Act of 1934 (hereafter referred to as the Act), being 15 U.S.C. §§ 78i and 78j.

Pending defendants' motion to dismiss for failure to state a cause of action under those Sections, plaintiff amended the complaint to state a claim under Sections 14 and 15 of the Act. Defendants' motion to dismiss as to Sections 9(a) and 10(b) was subsequently granted.

█ It is clear from these sections of the Act and from decided cases that the federal right created is in favor of persons or corporations who have purchased or sold stock and been defrauded by defendants in a sale and purchase transaction of securities. Kardon v. National Gypsum, 69 F.Supp. 512 (E.D.Pa., 1946); Birnbaum v. Newport Steel Co., 193 F.2d 461 (CCA 2, 1952), cert. den. 343 U.S. 956, 72 S.Ct. 1051, 96 L.Ed. 1356 (1952); Jachimiec v. Schenley Industries, Inc., Docket No. 15027 (CCA 7), cert. den. 382 U.S. 841, 86 S.Ct. 46, 15 L.Ed.2d 82 (1965); O'Neill v. Maytag, 339 F.2d 764 (CCA 2, 1964); Vine v. Beneficial Finance Co., Inc., 252 F.Supp. 212 (S.D. N.Y., 1966); Chashin v. Mencher, 255 F.Supp. 545 (S.D.N.Y., 1965); Defiance Industries, Inc. v. Galdi, et al., 256 F. Supp. 170 (S.D.N.Y., 1964); Kremer v. Selheimer, 215 F.Supp. 549 (E.D.Pa., 1963); Donovan, Inc. v. Taylor, 136 F.Supp. 552 (N.D.Calif., 1955).

In addition, historical attempts to broaden Section 10(b) by amendment have been repeatedly rejected in Congress. S.3915, H.R. 11, 129, 84th Congress, 2d Sess. 1956; S.2545, H.R. 9327, 85th Congress, 1st Sess. 1957; S.1179, H.R. 2480, 86th Congress, 1st Sess. 1959. Sec. 103 Cong. Record 11636; SEC Legislation, Hearings before a Subcommittee of the Committee on Banking and Cur-

rency of the U.S. Senate, 86th Congress, 1st Sess. 1959, at 331.[1]

Also, the Securities Exchange Commission has made no attempt to amend Rule X–10(b)–5, even in view of a line of strong decisions restricting 10(b) and Rule X–10(b)–(5) to purchase and sale situations. Hooper v. Mountain States Securities Corp., 282 F.2d 195 (CCA 5, 1960), cert. den. 365 U.S. 814, 81 S.Ct. 695, 5 L.Ed.2d 693 (1961); Ruckle v. Roto Am. Corp., 339 F.2d 24 (CCA 2, 1964); McClure v. Borne Chemical Co., 292 F.2d 824 (CCA 3, 1961); Pettit v. American Stock Exchange, 217 F.Supp. 21 (S.D.N.Y., 1963).

Congress undoubtedly realizes that the purchase and sale of stock under 10(b) is an open stock market and a common marketplace of transaction. Thus, if fraud is involved, sufficient statutory and common law remedies are available.

After a careful review of the above authorities, the only conclusion to be drawn is that rights of action under these sections of the Act inhere only in purchasers or sellers.

It now appears that the claim under Section 15 of the Act is without merit; therefore, the gravamen of this case is a claimed violation of § 14 of the Act, 15 U.S.C. § 78n, specifically a violation of 17 CFR § 240.14a–9, which reads as follows:

"No solicitation subject to §§ 240.-14a–1 to 240.14a–10 shall be made by means of any proxy statement, form of proxy, notice of meeting, or other communication written or oral containing any statement which at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading or necessary to correct any statement in any earlier communication with respect to the solicitation of a proxy for the same meeting or subject matter which has become false or misleading."

■ In brief, plaintiff alleges the existence of a conspiracy involving an attempt by defendants Kleiner and Kleiner, Bell to take over control of Studebaker Corporation for the purpose of securing an ultimate merger with Allied Products Corporation, co-defendant herein.[2]

The existence of such a conspiracy would be in contradiction to the statement contained in the proxy materials submitted to the Securities Exchange Commission by the Committee, and approved for distribution by the Securities

---

1. In this regard, the following quote from Schlesinger's, The Coming of the New Deal, page 445, is apropos:

" 'The Act,' said Professor William O. Douglas of the Yale Law School, 'is a nineteenth-century piece of legislation.' It ignored the need to manage investment; instead of facilitating economic planning, it aimed at restoring a lost world of freely competing small units. 'It was of a decidedly secondary character,' Douglas said, so far as correcting the evils of high finance was concerned, * * * ."

While these comments were in relation to the 1933 Act, their views seem fully as applicable to the 1934 Act.

Thirty-two years have elapsed since the passage of the Securities Exchange Act. Science, technology and finance have progressed more in this period than in the preceding century. In all this time, the basic nature of the Act remains the same.

Even as originally proposed the Act was bitterly opposed and fiercely resisted by corporations, stock and brokerage communities and financiers. See Morison, The Oxford History of the American People, p. 958–9 (1965); Dumond, America in Our Time, pp. 522–26 (1947).

2. It is not for the court to pass on the merits of any claimed merger, since the stockholders would determine this by voting on any such proposal. Nor can the court pass on the wisdom of the claimed vehicle for the merger, convertible preferred stock, since it is a common and increasingly popular avenue for mergers and possesses advantages as well as risks, depending upon the particular situation. See, e. g., Newsweek, April 25, 1966, p. 74.

Exchange Commission on March 31, 1966, which reads as follows:

"Contrary to press reports and other rumors, neither the nominees, the committee members, nor any other participants, have or have had any arrangements or understandings, direct or indirect, with Allied Products Corporation, or with the officers or directors thereof, with respect to merger proposals, tender offers, or any other matters."

3. Plaintiff in part predicates the jurisdiction of this court upon the claim that damages in the form of customer hesitancy and employee uncertainty have resulted to plaintiff from the alleged conspiracy and that it will be damaged by a prima facie tort arising from the violation of the statute.

In Michigan, a conspiracy is a combination of two or more persons, by some concerted action, to accomplish a crime or unlawful purpose, or to accomplish a purpose not unlawful, but by crime and unlawful means. Veriden v. McLeod, 180 Mich. 182, 146 N.W. 619 (1914); Fenestra v. Gulf American Land Corp., 377 Mich. 565, 593, 141 N.W.2d 36 (1966). At common law, on the writ of conspiracy it was required that two or more should be joined and found guilty; one could not be found guilty and the others acquitted. However, in an action of trespass on the case—in the nature of conspiracy, which superseded the common law writ, even if service were sought under the general rule, judgment may be returned against one in the face of an acquittal of others, because the foundation of the action is damages and not conspiracy. Auto Workers' Temple Assn. v. Janson, 227 Mich. 430, 433, 198 N.W. 992 (1924).

"The law is well established that in the civil action for damages resulting from wrongful acts alleged to have been committed in pursuance of a conspiracy, the gist or gravamen of the action is not the conspiracy but for the wrongful act causing the damages. The conspiracy standing alone without the commission of acts which cause damage would not be actionable. The cause of action does not result from the conspiracy but from the acts done." Roche v. Blair, 305 Mich. 608, 613, 614, 9 N.W.2d 861, 863 (1943).

A prima facie tort, if any, resulting from violation of Section 14(a) (if the proxy statement were false or misleading) would

## JURISDICTION

The initial problem facing this court is that of jurisdiction. The subject matter jurisdiction is clear, as well as personal jurisdiction over plaintiff Studebaker and defendant Allied. The personal jurisdiction over defendants Kleiner and Kleiner Bell & Co., however, is subject to some severe tests.

Plaintiff relies primarily[3] upon the appearance of newspaper stories

not proximately cause injury to the corportion.

The deleterious effect of a threatened proxy battle, tender or merger, is clearly a foreseeable consequence of Studebaker's present position as an eligible candidate for tender offers, mergers, and attempts to take over the company by reason of its astonishingly thin management participation in stock ownership, its earnings, its tax loss carry-over, and the nature of its divisional operations. These conditions generated wide interest, as is clearly shown on this record by the fact that Sidney Kreiser, a customer of First National Bank of Minneapolis, who is associated with several companies, expressed interest in taking a position in Studebaker; the fact that Mr. J. Edward Quest, of Minneapolis, executive vice president of Loewi & Co., Inc., a member of the New York Stock Exchange, conferred with Mr. Guthrie on taking an interest on behalf of Gould National Batteries, and the fact of the Murphy tender offer. These activities are in accord with recent historic behaviors of common stock companies which have been subject to tender offers and possible mergers in the last few years. None of these activities are illegal in and of themselves; they often represent highly competitive bidding for the securities of such candidates and companies similarly situated to Studebaker, on the securities exchanges across the country.

This would be the real proximate cause of any uncertainty among key employees or customer accounts so long as Studebaker is as uncertainly situated as it is, threatened by takeovers from outside interests. The uncertainty, if any, continues to exist, and will not be resolved unless management itself has greater security in stock ownership, or an actual acquisition of Studebaker, or by Studebaker of another corporate entity, is accomplished.

Up to release of the Committee proxy statement over the broad tape, there was

in this District, and upon the April 1 release of the Committee over the Dow-Jones broad tape, which release appeared on that facility in Michigan (although after the commencement of this suit).

In the case of Hooper v. Mountain States Securities Corp., supra, a telephone call into the district in connection with a fraudulent scheme was held sufficient to confer jurisdiction under the Act as a "use" of the mails or other facilities of interstate commerce.

Although dealing with different sections of the Act, the cases of Kopald-Quinn & Co. v. United States, 101 F.2d 628 (CCA 5, 1939), cert. den., Ricebaum v. United States, 307 U.S. 628, 59 S.Ct. 835, 83 L.Ed. 1511 (1939); Fratt v. Robinson, 203 F.2d 627, 37 A.L.R.2d 636 (CCA 9, 1953); Landay v. United States, 108 F.2d 698 (CCA 6, 1939); Pace v. United States, 94 F.2d 591 (CCA 5, 1938), and Robinson v. Difford, 92 F. Supp. 145 (E.D.Pa., 1950), all concern use of the mail and the facilities of interstate commerce as a basis for jurisdiction, and in some of those cases the use of the mails was quite minimal and incidental to the entire scheme alleged.

While some of the preceding cases deal with criminal aspects of violations of the Act, the Hooper case takes the view that any acts sufficient to constitute offenses under the criminal statutes would be sufficient basis for extraterritorial service under Section 27 of the Act, which is the general jurisdictional statute.

■ However, even taking this liberal view most favorably to plaintiff's position, the court has been cited to no cases, nor has it found any, which hold that the mere appearance of newspaper stories in the District, or the appearance of a news release on the broad tape in the District, is a "use" of the facilities of interstate commerce which constitutes an act within the District.

Thus, there is no definite authority to sustain jurisdiction on the facts of this case, and were it not for the consent to jurisdiction by defendants Kleiner and Kleiner, Bell in final argument for the purposes of securing a termination to this litigation, the court would be hard put to find a basis for jurisdiction.

More will be said at a later portion of this opinion on the bearing of this jurisdictional question on another aspect of the case, but for now, it is sufficient to say that this court will proceed on the basis of the consent to jurisdiction, so as to secure to Studebaker's stockholders the federal right created by Section 14 of the Act and avoid a further multiplication of suits. See division on "Relief," infra.

### ISSUE

A recurring theme in the proofs and the arguments in this case was the surprise, one might even say the shock and indignant attitude which plaintiff evidenced at the thought of a takeover by a smaller company.

It is apparent from the evidence that there was interest on the parts of both Mr. Kleiner and Allied in discussions with Studebaker over possible community of interest between Allied and Studebaker. The testimony of the witnesses establishes this, and it is further clear from the facts freely admitted by Mr. Kleiner in his affidavit submitted to the Securities Exchange Commission in connection with the proxy materials filed by the Committee. (Ex. K-7, pp. 3, 4, 8.)

■ However, as admitted by Mr. Guthrie before this court (Tr. p. 119), there is absolutely no illegality in the purported plan of merger between Allied and Studebaker, and the mere existence of an arrangement or understanding for such a purpose, standing alone, is not of itself unlawful.

nothing on which a claim of illegality could be founded, and any consequential damages would be the normal incidents

and consequent burden of stock listings on public securities exchanges.

See in this regard, Fenestra v. Gulf American Land Corp., 377 Mich. 565, 141 N.W.2d 36:

"It is one of the risks of publicly-held corporations that a total stranger may purchase a controlling interest in a particular corporation. If the purchase is not unlawful, the courts may not superimpose their suspicions, predilections and judgments upon the actions of the entrepeneur (sic)." Id. at 608, 141 N.W.2d at 55.[4]

The existence of any arrangement or understanding here would only be unlawful because of the statement quoted above, contained in the proxy materials. The single issue confronting the court in this hearing on a preliminary injunction is whether or not the mutual self-interest apparent on the parts of both Kleiner, Kleiner, Bell & Co., and Allied Products, is sufficiently linked together to establish a prima facie case that there was an understanding or arrangement between these parties in regard to a proposed merger between Allied and Studebaker Corporation should the Kleiner interests gain control of the Studebaker Board.

## DISCUSSION OF THE FACTS

For the reasons which will be forthcoming, the court finds the existing facts insufficient to sustain a finding of an arrangement or understanding sufficient to warrant the grant of a preliminary injunction.

 While it is not incumbent upon plaintiff to show an absolute right to final judgment at a hearing on a preliminary injunction, Hamilton Watch Co. v. Benrus Watch Co., 206 F.2d 738 (CCA

2, 1953), there is the burden of showing probable cause for eventual success in the case. Graham v. Triangle Publications, Inc., 233 F.Supp. 825 (E.D.Pa., 1964) aff'd 344 F.2d 775 (CCA 3, 1965); Chicago South Shore & South Bend R.R. v. Monon R.R., 235 F.Supp. 984 (N.D. Ill., 1964).

There are major obstacles to a preliminary conclusion from the facts that there was an arrangement or understanding between Kleiner and other members of the Committee, and Allied.

The first of these is that on February 11, the date on which Kleiner arranged the meeting between management of Allied and the management of Studebaker (a fact, again, freely admitted by Kleiner in his affidavit to the Securities Exchange Commission), a meeting pointed to by plaintiff as strongly evidencing an arrangement or understanding between Kleiner and Allied, Mr. Kleiner *had no knowledge of the existence of the large block of stock which ultimately gave him some bargaining power in his relations with Studebaker.*

The actual holdings of Kleiner, Bell at that time were in the neighborhood of 20,000 to 30,000 shares, and that amount is certainly inconsistent with any attempt or design to control Studebaker for any purpose whatsoever.

In relation to the claimed purpose of taking control of Studebaker for the purpose of furthering any transaction with Allied Products, it must be noted that at the outset Mr. Kleiner would have been satisfied with one seat on the board, which in no way approaches control, and right up until the commencement of this

---

4. The findings of fact and conclusions of law by this court in Muskegon Piston Ring Co. v. Gulf & Western, 328 F.2d 830 (CCA 6, 1964) (trial decision unreported), are not authority in this case. This court commented on the rapidity with which a plan to take control of one company by another was carried out and related this to Sec. 10(b) of the Securities Exchange Act.

However, in that case the issue was violation of Sec. 7 of the Clayton Act and the purpose of the control was found to

be to effectuate a plan which would have violated that Section.

There is a substantial difference between an arrangement or understanding in this area of trading in securities of publicly-held corporations, and an arrangement or understanding to violate the Clayton Act. One is legal, and the other is illegal; one seeks to limit free competition and violates the law, and the other is an exercise of free competition in the open common market and securities exchanges.

lawsuit, the Committee would have been willing to settle for less than a majority of the board of directors (four of nine, or, on an expanded board, five of twelve). Thus, any proposal involving Allied Products would have had to gain the approval of at least one member of the present board of directors.

Thus, the claimed purpose of taking control of Studebaker finds no support anywhere in the evidence, since in all of the negotiations preliminary to the commencement of this suit, the Kleiner group would have settled, without a proxy contest, for less than majority representation on the board. Even now, five of the six members of the Committee slate would have to be elected to give this group the actual control which is stated by plaintiff to be, and to have been at all times, the design of the Committee.

In addition, Mr. Morton Phillips, one of the original purchasers of the block, who acquired 20,000 shares of Studebaker on February 16, sold these shares within a very few days, a fact which again is inconsistent with a plan or design on the part of Kleiner to take control through the purchase of the block by his clients.

Also, Mr. Frank Gittlin, a limited partner of Kleiner, Bell sold 5,000 shares of Studebaker on March 7. And finally, it must be pointed out that Emerman, Sherman and Drexler, officers of Allied Products, sold 4,200 shares of Studebaker stock *after* holding the February 15 meeting with Messrs. Burlingame and Pratt, of Studebaker.

Much has been made of the discussions between Mr. Guthrie and Mr. Kleiner, at which Mr. Guthrie expressed the view that Kleiner was acting on behalf of Allied Products Corporation, and it was for this reason that he would be denied representation on the Studebaker board.

Mr. Kleiner contends that at no time was he in a position to prevent Allied Products from making a tender offer, since his holdings in Allied did not approach anything which was significant enough in amount to dictate the policies of that company. In addition, he points to the fact that 39% of the stock of Allied is held by management.

Mr. Guthrie's lack of interest in any Allied transaction was surprising to Mr. Kleiner, only insofar as he felt that the Studebaker management and full Board of Directors should consider and pass upon this question, as he felt Mr. Guthrie was speaking as an individual.[5]

In relation to this point of the belief by Studebaker that Mr. Kleiner in his meetings with Mr. Guthrie had clearly evidenced a connection with Allied, reference must be made to the minutes of the March 9 meeting of the board of directors of Studebaker (Ex. K–13, p. 2), in which it is stated that representation of the Kleiner group on the Studebaker board would not be in the best interests of the corporation, and it was further stated:

"Furthermore, based on the information as reported in the press and widely circulated in the financial community, the securing of Board representation

---

5. The relevant portions of Mr. Kleiner's testimony are as follows:

Q. All right. Did you generally describe your knowledge of Allied Products to him?
A. Yes, I did.
Q. What were his comments with respect to that?
A. Well, he said, "Well, I'm not interested in having any Allied deal." I commented, "Well, I think that's really something for the Directors and Management." He said, "Well, it's a smart idea, but they are a little company, and what they want to do we

can do with Studebaker." And I commented, "Well, that's surprising to me, because the reports that I have received was that Mr. Burlingame and Mr. Pratt were intrigued with the general idea of what had been discussed." And Mr. Guthrie said, "Well, I don't care about that. I run the show, and I am not interested in having an Allied deal." So, that was a twinge.
Q. Just a minute. Are you stating Mr. Guthrie's words?
A. Yes, those were his words. (Tr. P. 440.)

by the Kleiner group was deemed to be only the first step in an attempt to combine Studebaker with Allied Products, on what appeared to be an unsound basis insofar as the Studebaker directors were concerned."

If the conversations with Mr. Kleiner were in any way as clear as Mr. Guthrie would have the court believe, there is certainly stronger basis for the opinion expressed in these minutes than information reported in the press and circulated in the financial community.

One of the points heavily relied upon by Studebaker as proof of a conspiracy is the possession by Kleiner of certain confidential information relating to the operations of Studebaker.

Studebaker has a credit arrangement with a network of six banks, one of which is the First National Bank of Minneapolis, of which Mr. Robert Fischer is Executive Vice President.

On January 27, 1966, Studebaker sent a confidential letter to these banks requesting modification of its loan agreements, and containing information regarding the divisional operations of Studebaker, which information has not been made public.

Mr. Guthrie contended that Mr. Kleiner in his discussions displayed a surprising knowledge of the operations of Studebaker, some of which knowledge Mr. Guthrie felt could only have been obtained through access to the confidential information contained in the January 27 letter, and it was on this basis that Studebaker took the unusual step on February 24 of releasing estimated 1966 earnings to the press.

However, the only specific knowledge that Mr. Guthrie mentioned was the fact that in the discussions, Mr. Kleiner allegedly referred to the supposedly 13.5 million dollar profit for Studebaker in the year 1966 in his discussion of the operation of a convertible stock.

This figure coincides with the Studebaker management's estimated earnings for 1966 contained in the letter.

It is noteworthy that in an earlier deposition taken before this court, April 3, 1966, Mr. Guthrie did not mention the 13.5 million dollar amount, but named 10.5 million dollars as the figure used by Mr. Kleiner, and at no time did he or any other of plaintiff's witnesses make any further attempt to develop the nature of the purported inside information possessed by Mr. Kleiner, although there was ample opportunity to do so.

It was simply claimed that a breakdown of the divisional operations is not contained in the Studebaker annual report and that Mr. Kleiner seemed to know something about them.

This was denied by Mr. Kleiner, who claimed that one of the purposes of the February 11 meeting with Mr. Guthrie was to attempt to obtain such information. Insofar as the figure of 13.5 million dollars is concerned, this in and of itself is totally insufficient to convince the court that Mr. Kleiner possessed inside information, since Studebaker had shown a progression from a 6 million dollar profit in the year 1963, to an 8.5 million dollar profit in 1964, 10.5 million in 1965, and a figure of 13.5 million dollars estimated in 1966 would be a simple arithmetic progression, especially for one as thoroughly skilled in financial doings as Mr. Kleiner.

Thus, from the presentations made to the court, a finding must be made that no information of a confidential nature was in the possession of Mr. Kleiner.

Another of the points relied upon by plaintiff in support of proof of a claimed understanding or arrangement, is the fact that Mr. H. L. Korda, who had met with Mr. Kleiner and Mr. Robert Fischer, of First National Bank of Minneapolis in late November 1965, sent letters to Mr. Kleiner on February 16 and February 23, which request participation in fees received by Kleiner, Bell & Co. from sales of Studebaker stock and fees for any "activity with Studebaker, and, for example, Allied Products * * *." The letter of February 16 also asks that any obligations to Mr. Fischer be kept, as he was the "originator."

Mr. Korda stated that he did not know the nature of any transaction between Studebaker and Allied, but if there was to be one, he wanted to share in any profits gained as a result. Mr. Korda may be characterized as a highly individualistic person, alert to the possibilities of financial return. His attitude may best be described by the following quote from his deposition testimony: "You would be surprised what you get in this life when you ask." (p. 59.) As to obligations to Mr. Fischer, these were described as arising out of the fact that he had first called attention to Studebaker as a good investment and was primarily interested in seeing that the best interests of Minneapolis and the bank were safeguarded in any stock purchases.

Mr. Kleiner pointed to the fact that any such fees as would be received by Kleiner, Bell could not possibly be shared with anyone according to the strict rules of the New York Stock Exchange.

The court is satisfied, considering these letters in light of all the facts in the case, that they do not indicate knowledge of a claimed agreement or understanding, but are rather an irresponsible request for participation in financial gain, based upon the rumors of an Allied takeover of Studebaker.

In a further effort to substantiate the claims of an arrangement or understanding, plaintiff points to the testimony of two security analysts, Milton C. Schlein and Charles C. Reilly (whose depositions were introduced into evidence by plaintiff), to attempt to show that Kleiner, Bell was privately assuring purchasers of an expected Allied transaction.

Upon close reading of these depositions, it is evident that their testimony simply does not support such a claim.[6]

---

6. The Reilly deposition, during a discussion of the content of a conversation between the witness and Frank J. Manheim, one of the Studebaker directors, contains the following questions and answers:

MR. GREENWALD: I believe, if I recall what was said there, also, he indicated that you stated you were buying—you were recommending the Studebaker stock because Kleiner, Bell interests had told you they were able to put over a deal. Is that what you said, or you said that you possibly might have said that?

THE WITNESS: I don't believe I did, but it is possible.

MR. GREENWALD: If you had made a statement like that, would that reflect the reason why you bought the stock?

THE WITNESS: No.

MR. GREENWALD: Was there, in fact, a representation of that kind made to you—

THE WITNESS: No.

MR. GREENWALD: (Continuing)—they would be able to put over the deal.

THE WITNESS: No. Part of my intention with Frank was to draw him out to see how opposed to this deal they were, if there was going to be a deal, and to probe their feelings. (P. 40.)

The Schlein deposition, in discussing conversations between Mr. Schlein and Mr. Fred Marcus, of Carter, Berlind and Weill, who had told him that control of Studebaker would be obtained, contains the following questions and answers: (as to the first conversation)

Q. Didn't you consider that you ought to note that at least one brokerage firm was operating on the assumption of a merger?

* * * * * *

A. I classified it with rumors, that sort of statement with rumors, because 800,000 shares is not enough, and all I had was Marcus' word. (Pp. 47–8.)

(As to second conversation:)

Q. Do you have any recollection of what was said or the substance of what was said to Mr. Marcus?

A. Yes.

Q. What is your recollection?

A. I asked him is the merger going to happen.

Q. And Mr. Marcus said what?

A. I came away with a negative feeling. That doesn't mean that he said no, but I remember—you see, what he said was so unimportant to me, that in fact it was not at all what I wrote or thought.

But I remember I came away with the feeling that no, this probably will not go through, and he agreed. As a matter of fact—at that time—and this I remember distinctly—he

In summation of the facts, it must be said that plaintiff has presented a case which, by reason of the history of association between Allied and Mr. Kleiner, has a certain surface appeal. However, upon careful analysis of all the testimony and exhibits, the high points of plaintiff's case do not stand under the scrutiny which must be brought to bear upon them in the context of the entire picture presented to the court.

Stock market interest in Studebaker was not confined by any means to the defendants here. There is, therefore, nothing which has been presented to this court which is inconsistent with a legitimate purchase, for investment purposes, of Studebaker stock. And in view of the Studebaker board's failure to take a position regarding the Murphy tender,[7] there is nothing inherently suspect in Mr. Kleiner's claimed belief that there was an apparent lack of concern over large-scale ownership of Studebaker stock.

Furthermore, it is clear from this record that had the Murphy tender offer come to a successful result, Murphy and his attorney, a Mr. Vernon Bortz, would have come on the Studebaker board[8] (minutes of February 10, 1966, Studebaker board meeting, p. 7, Ex. K–2; Guthrie deposition, p. 43). There is,

then, nothing unusual in a man such as Mr. Kleiner, feeling a responsibility toward a significant number of shares, expecting some representation on the board of directors.

Additionally, there is nothing inconsistent in his stated claim that his desire for board representation arose only after what he considered unilateral action on the part of Mr. Guthrie regarding the Allied discussions aroused his suspicions concerning the capabilities of the Studebaker board as a representative body.

All phases of Mr. Kleiner's testimony withstood stern and rigorous cross-examination by most able counsel.

Finally, there is not one shred of evidence in this record to show that defendants Kleiner and Kleiner, Bell represented to any purchasers that the Studebaker stock should be purchased to carry out any Allied transaction. Nor is there any proof whatsoever of any commitments on the part of any purchasers to vote their stock in a preconceived way, nor is there any evidence of a voting trust. In short, nothing to substantiate a purported plan of takeover.

Having considered all the testimony and exhibits in the case, plus the numerous depositions offered at the hear-

---

agreed that the Allied Products stock was not for us after all.
That was pretty much it. It was a worthless call. (P. 50.)

Q. But he did not specifically say to you that there would not be a merger, did he?

A. I can't say that. I came away with that feeling, but whether he said it in so many words.
Remember, my feelings throughout here was that there wouldn't be, that this was just rumors and that it couldn't be done, so he said nothing to change this opinion. (P. 51.)

7. It is to be noted that no stockholder who sold Studebaker stock after the Murphy tender was defrauded by any of the defendants. Each selling shareholder received a higher price than the Murphy tender of $30 a share (as to which the Studebaker board adopted a position of neutrality) ranging between $32 to $40 per share.

The stockholders whose stock was sold at the crossing of the board, if influenced to sell this stock at all, were probably influenced more by the Murphy tender than any action of defendants. Neither was management nor the corporation defrauded. Management was knowledgeable of inside information and in a position to evaluate market rumors.

8. While the Studebaker board ostensibly remained neutral publicly on the Murphy tender, it in fact took an undisclosed position in favor of it. In addition to the understanding regarding board membership, it favored one of its directors, Frank Manheim, a partner in the investment banking firm of Lehman Brothers, by not only agreeing, but urging him to act as tender agent for Murphy rather than as a director of Studebaker, and in the interests of Studebaker stockholders, as if such fiduciary relationship could be turned on and off at will. (February 10, 1966, minutes of meeting of Studebaker board of directors, Ex. K–2.)

ing, the court is unable to find sufficient basis for the granting of a temporary injunction.

## RELIEF

The court is not, however, satisfied that the Committee proxy materials as presently drawn, should be permitted to go to Studebaker stockholders.

■ The federal rights secured by Section 14(a) are protection of "fair corporate suffrage," freely exercised by corporate stockholders.

The latest pronouncement by the Supreme Court on this issue is found in J. I. Case Co. v. Borak, 377 U.S. 426, at page 431, 84 S.Ct. 1555, at page 1559, 12 L.Ed. 2d 423, 427 (1964):

"The purpose of § 14(a) is *to prevent management or others from obtaining authorization for corporate action by means of deceptive or inadequate disclosure in proxy solicitation.* The section stemmed from the congressional belief that '[f]air corporate suffrage is an important right that should attach to every equity security bought on a public exchange.' H.R.Rep.No. 1383, 73d Cong. 2d Sess. 13. *It was intended to 'control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which * * * [had] frustrated the free exercise of the voting rights of stockholders.'* Id., at 14. 'Too often proxies are solicited without explanation to the stockholder of the real nature of the questions for which authority to cast his vote is sought.' S.Rep.No.792, 73d Cong. 2d Sess. 12. These broad remedial purposes are evidenced in the language of the section which makes it 'unlawful for any person * * * to solicit or permit the use of his name to solicit any proxy or consent or authorization in respect of any security * * * registered on any national securities exchange in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest *or for*

the protection of investors.' (Italics supplied.)" (Emphasis supplied.)

■ Since the primary right involved is that of the stockholders, this court may treat plaintiff's case in the nature of a derivative action for the benefit of stockholders.

The Sixth Circuit Court has likewise addressed itself to this issue in Dann v. Studebaker-Packard Corp., 288 F.2d 201 (1961), when at page 208, the Court quoted from House Report on the Bill (House Report No. 1383, 73rd Cong. 2d Sess. (1934) pp. 13–14) as follows:

"Fair corporate suffrage is an important right that should attach to every equity security bought on a public exchange. Managements of properties owned by the investing public should not be permitted to perpetuate themselves by misuse of corporate proxies. *Insiders, having little or no substantial interest in the properties they manage often have retained their control without adequate explanation of the management policies they intend to pursue * * * Inasmuch as only the exchanges make it possible for securities to be widely distributed among the investing public, it follows as a corollary that the use of the exchanges should involve a corresponding duty of according shareholders fair suffrage.* For this reason, the proposed bill gives the * * * Commission power to control the conditions under which proxies may be solicited with a view to preventing the recurrence of abuses which have frustrated the free exercise of the voting rights of stockholders." (Emphasis supplied.)

As the proxy material ready to be distributed by the Committee now stands, it is, while not false, misleading to the eyes of the court in view of the current rumors regarding Allied and Studebaker, and thus inconsistent with the expressed purpose of 17 CFR 240.14a–9.

■ The proxy materials are misleading because the statement in issue in this case, while true in all respects, would convey to those receiving it the impres-

sion that there is absolutely no connection between members of the Committee and Allied, and no foundation at all for the rumors. The Studebaker stockholders are entitled to know of the associations and interests which certain of the Committee members have with Allied so that they may more fully exercise their judgment in the proxy contest.

■ While the court finds no showing of any arrangement or understanding between the Committee members and Allied, it is fair to say that because of the demonstrated associations and relationships there is the likelihood of an interest by certain members of the Committee if any transactions involving Allied were to come before the board. Even though no inferences of bad faith may be drawn from these facts, and it is presumed that members of the board of directors will act in the best interests of their corporation, this court feels that this additional information should be furnished to those receiving proxy materials in this case. The Securities Exchange Commission felt that in view of the press reports and rumors, the Committee proxy materials should contain the statement here involved. The court simply believes that the shareholders should be more completely informed.

■ The holding of an annual meeting by Michigan corporations is an implicit requirement of M.S.A. 21.38, Comp. Laws 1948, § 450.38. See, 5 Fletcher, Cyclopedia of Corporations, 20 (1931).

■ A corporation has been defined as a body of individuals united as a single separate entity. When corporate powers are vested in the shareholders or members, they repose in them collectively as a body and not as individuals. That is, individuals have no power to act as or for the corporation except at a corporate meeting called and conducted in accordance with law. 6 Callaghan, Michigan Civil Jurisprudence (1958).

■ Only at the annual or specially called meeting of the shareholders can the individual shareholders exercise their right of suffrage. An undue delay in holding the annual meeting of shareholders might dilute or defeat their right of free suffrage in this case.

■ Fair and full disclosure is of the essence of free suffrage. Because the annual meeting of Studebaker has already been delayed, this court should not countenance any undue delay in the holding of elections, for the benefit of Studebaker stockholders.

Accordingly, this court will order production of the stockholder list (upon proper amendment of the proxy statement), set a new record date, a new annual meeting date, and will supervise the content of the proxy materials insofar as they relate to Allied and Studebaker.

Plaintiff has filed a memorandum in which it takes exception to this form of relief, claiming that the court has no power to fashion such relief and urging that the restraining order against it be lifted, while that against defendants be continued, thus permitting Studebaker to hold uncontested elections for the existing directors.

■ The broad language of the J. I. Case Co. v. Borak case, supra, advises courts to be "alert to provide such remedies as are necessary to make effective the congressional purpose." Id. at 377 U.S. 433, 84 S.Ct. 1560, 12 L.Ed.2d 428. Earlier in this opinion there is a discussion of the congressional purpose behind § 14(a), and the relief which the court is disposed to grant is believed best suited to effectuate free corporate suffrage, bearing in mind that protracted litigation is a corporate expense which is ultimately borne by the stockholders and that such litigation can also be a tactic to perpetuate corporate management without the opportunity for stockholders to choose from an opposition slate.[9] Thus, if a fair

---

9. Again, a quote from the Fenestra v. Gulf Amer. Land. Corp. case, supra, is pertinent, since self-interest is evident on each side of this case:

"Although substantial self-interest was shown on all sides, the conduct of the Gulf group in question here, insofar as it had progressed, was not proscribed

election can be held (and with the corrections in the proxy material suggested by this opinion, this will be assured), the court is under a duty in equity to provide the most expeditious and least expensive remedy available.

In addition, it was plaintiff which first invoked the equity jurisiction of this court, asking in paragraph 5 of the request for relief in the complaint that "the court grant such other and further relief, as may be equitable between the parties."

In view of the pending action in the state court of New York, plaintiff urged this court to take pendent jurisdiction over the case in all its phases, citing United Mine Workers of America v. Gibbs, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218. This the court did, with no objections being raised at that time. Nor was any objection raised to the supplemental temporary restraining order filed April 13, which clearly contemplates relief of this kind.[10]

■ The court also notes, in the words of the maxim, that he who seeks equity must do equity, and plaintiff in filing the Gittlin suit in the New York District Court on March 22, nine days before commencement of the action here, had every opportunity to litigate the entire case before courts exceptionally well acquainted with suits of this sort. The complaint (Ex. K–15), and an affidavit, (see Ex. K–18, p. 2) filed in support of that complaint, clearly show that plaintiff was aware of the facts giving rise to

this suit, although the issue in that case was carefully circumscribed by plaintiff.

Despite the planned limitation of the issue before the New York District Court, the limiting paragraph itself contains a broad assertion of knowledge on the part of Studebaker:

"8. Information has come to the attention of Studebaker which indicates violation by Respondent and others associated with him of many aspects of the Securities Act of 1933 as amended, the Act, and the SEC Regulations. This action is limited to, and deals only with, the violations by Gittlin of those provisions of the Act, and of the SEC Regulations, relating to the solicitation by Gittlin and others associated with him of the written authorizations referred to in the New York Proceedings." (Ex. K–15.)

And the relief sought from that court was an injunction, "enjoining Gittlin, his agents and all other persons, firms and corporations acting in concert, or in participation with Respondent" not only from using or obtaining authorizations, but also "from otherwise violating the Act and the Regulations in the solicitation of any proxy within the meaning of the Act and the SEC Regulations."

■■ In this context, the court can certainly consider the ease with which, by the very design of the Federal Rules themselves, a case can be completely disposed of in a single action, as bearing on the good faith of a party. As stated

---

by law. On the other side of the ledger, the conduct of Fenestra's six management directors, who initiated this action does not appear to have been entirely selfless. They, too, had a particular interest in who controlled the corporation because such control would determine to a large extent their salaries, stock options or fees." Id., 377 Mich. at 608, 141 N.W.2d at 55.
It is not the function of the courts, under § 14(a), to decide which faction shall prevail. That judgment is for the stockholders. However, it is the function of the courts to see that that judgment is as well informed as possible, so that when the stockholders are given

their annual opportunity to have a voice in the affairs of their corporation, they are fully prepared to evaluate those who would seek to guide the affairs of that corporation.

10. Paragraphs 3 and 4 of that order are:
3. The stockholders list of Studebaker Corporation shall not be given to the parties defendant or any associate of the parties defendant until the order of this Court.
4. The annual meeting of the stockholders of Studebaker Corporation shall be postponed until such time as the Court shall order, after consideration of this case.

by Judge Goodrich of the Third Circuit Court of Appeals in Williamson v. Columbia Gas & Electric Corp., 91 F.Supp. 874 (D.Del., 1950), aff'd 186 F.2d 464 (CCA 3, 1950):

"The purpose of the principle of res judicata is to end litigation. The theory is that parties should not have to litigate issues which they have already litigated *or had a reasonable opportunity to litigate*. A reading of the early cases as compared with recent ones makes it clear that the meaning of 'cause of action' for res judicata purposes is much broader today than it was earlier. Formerly the whole aim in pleading, and in the elaborate system of writs, was to frame one single legal issue. That being the guiding principle, the phrase 'cause of action' came to have a very narrow meaning. If the theory in the second suit was unavailable under the writ used in the first suit, the plaintiff had no opportunity to litigate it there and so plaintiff was not barred by res judicata. The force of the rule is still operative but the scope of its operation has been greatly limited by the modernization of our procedure. The principle which pervades the modern systems of pleading, especially the federal system, as exemplified by the free permissive joinder of claims, liberal amendment provisions, and compulsory counterclaims, is that the whole controversy between the parties may and often must be brought before the same court in the same action." Id., 186 F.2d at 469–470. (Emphasis supplied.)

Also apropos is the following by Mr. Justice Frankfurter in Angel v. Bullington, 330 U.S. 183, 67 S.Ct. 657, 91 L.Ed. 832 (1947):

"Litigation is the means for vindicating rights, but it may also involve unwarranted friction and waste. The doctrine of res judicata reflects the refusal of law to tolerate needless litigation. Litigation is needless if, by fair process, a controversy has once gone through the courts to conclusion. Compare, e. g., Hazel-Atlas Glass Co.

v. Hartford-Empire Co., 322 U.S. 238, 244, 64 S.Ct. 997, 1000, 88 L.Ed. 1250, 1255. And it has gone through, *if issues that were or could have been dealt with in an earlier litigation are raised anew between the same parties*. Chicot County Drainage Dist. v. Baxter State Bank, 308 U.S. 371, 60 S.Ct. 317, 84 L.Ed. 329; [41 Am.Bankr.Rep., N.S., 508]." Id. at 330 U.S. 192–193, 67 S.Ct. at 662, 91 L.Ed. 838–839. (Emphasis supplied.)

The fact that the action was brought only against Mr. Gittlin in New York would not dilute the force of the above authorities, since judgments are conclusive between parties and those in privity with them. Holmes v. United States, 231 F.Supp. 971 (N.D.Ga., 1964). See Flota Maratima Browning, etc. v. Motor Vessel Ciudad, 218 F.Supp. 938 (D.Md., 1963), aff'd 335 F.2d 619 (CCA 4, 1964), Box v. Rundell, 179 F.2d 626 (CCA 10, 1950), Mendez v. Bowie, 118 F.2d 435 (CCA 1, 1941). And that defendants here are in privity with Mr. Gittlin in the alleged conspiracy is pointed out to the court by plaintiff's Memorandum in Support of Application for Preliminary Injunction, pages 6 and 7, by citing Rule 14(a) (11) (5) which defines a participant in a proxy solicitation as:

"(5) any person who * * * enters into any 'arrangement,' pursuant to any contract or understanding with a participant for the purposes of inducing the purchase, sale, holding or voting of securities * * * in support or opposition to a participant."

Plaintiff could handily have tried this case in New York, but chose instead to come to the Western District of Michigan, under the jurisdiction of this court. Then, after this court had made perfectly clear its attitude on depositions, plaintiff sought to avoid discovery of Mr. Manheim by deposition by relying upon a New York District Judge's ruling under Rule 30(d) of the Federal Rules of Civil Procedure that certain matters be inquired into only by interrogatories. Although the requested order was granted,

it must be observed the questions were well within the scope of the instructions which this court gave regarding depositions (at the request of plaintiff), the only possible objection being as to form, which is not one of the grounds for limitation under Rule 30(d).

There is thus a strong inference that plaintiff itself conspired against equity and is in violation of the equitable doctrine of unclean hands, especially in consideration of the strong line of cases from the Second Circuit strictly limiting actions under §§ 9(a) and 10(b) of the Act to purchasers or sellers of stock. Ruckle v. Roto American Corp., supra; O'Neill v. Maytag, supra; Birnbaum v. Newport Steel, supra; Defiance Industries, Inc. v. Galdi, supra; and Pettit v. American Stock Exchange, supra.

Plaintiff's attempt to urge a cause of action under those sections becomes even more suspect when considered in the extremely tenuous jurisdictional framework present in the Western District of Michigan, contrasted with the solid jurisdictional basis in New York, where both Studebaker and Allied stock are registered and traded on the New York Stock Exchange, where Kleiner, Bell has a partner on the floor of the Exchange, and where many of the meetings set forth in the facts of this case took place.

Thus, plaintiff's objections to this court's exercise of its equitable powers are not well taken. The language of J. I. Case Co. v. Borak, supra, supports the remedial measures which will be taken, and SEC v. Wong, 252 F.Supp. 608 (D.C. Puerto Rico, 1966), cited to the court by plaintiff sets forth in clear language the powers and considerations of equity:

"Once the general equitable jurisdiction of a District Court has been properly invoked, the broad and flexible powers inherent in such jurisdiction may be utilized to 'mould each decree to the necessities of the particular case.' Hecht Co. v. Bowles, 321 U.S. 321, 329, 64 S.Ct. 587, 592, 88 L.Ed. 754 (1944); Porter v. Warner Holding Company, 328 U.S. 395, 398, 66 S.Ct. 1086, 90 L.Ed. 1332 (1946); Mitchell v. Robert De Mario Jewelry Inc., 361 U.S. 288, 291, 80 S.Ct. 332, 4 L.Ed.2d 323 (1960).

"Where appropriate, this Court may utilize its inherent equitable powers, invoked by an injunctive action under Section 36, to do justice and grant full relief. Citations omitted.] Injunctive actions under the Securities Exchange Act are not distinguishable in their invocation of full equitable powers. [Citations omitted.]"

That federal courts have power to postpone annual meetings is clear. Henwood v. SEC, 298 F.2d 641 (CCA 9, 1962), cert. den. 371 U.S. 814, 83 S.Ct. 25, 9 L.Ed.2d 56 (1962); Union Pac. R. R. v. Chicago & Northwestern Ry. Co., 226 F.Supp. 400 (N.D.Ill., 1964); SEC v. O'Hara Re-Election (or Proxy) Committee, 28 F.Supp. 523 (D.Mass., 1939). The setting of the date of an annual meeting is not a drastic departure from this power.

Thus, this court retains jurisdiction of the case for the purpose of overseeing the content of the proxy statements insofar as they relate to Studebaker and Allied, and directs:

1. That the parties submit to the court their proposed proxy statements covering the interests and associations of Mr. Kleiner and other members of the Committee slate with Allied. The court will meet with the parties at 10:00 A.M., Thursday, May 26, 1966, to consider their initial proposals.

2. That the Studebaker stockholder list be furnished to defendants at such time as the proxy materials of the parties are approved for dissemination by both the Securities Exchange Commission and this court.

3. That a new record date for Studebaker stockholders be June 3, 1966.

4. That the annual meeting of Studebaker be set over until July 21, 1966.

5. That neither party disseminate their proxy materials until permitted to do so by this court.

6. That Studebaker release no additional stock issues before the annual meeting.

7. That the restraining orders heretofore in effect be and hereby are dissolved.

The court also requests that the Securities Exchange Commission come into the case as amicus curiae to assist the court in the execution of its directives.

Findings of fact and conclusions of law under Rule 52 of the Federal Rules of Civil Procedure are contained in this opinion.